In re Disbarment Proceedings Against CHARLES W. GERMAN, Appellant.—156 S. W. (2d) 678.

Court en Banc, October 25, 1941.

Motion to Dismiss Stricken from Files, November 26, 1941.

*Charles W. German,* appellant, *pro se.*

*P. L. Edwards, Elliot Norquist, Thomas R. Hunt* and *Clyde J. Linde* for Bar Committee.

 LEEDY, J.—This is a proceeding to disbar an attorney at law, Charles W. German, who appeals from a judgment of the Circuit Court of Jackson County finding him guilty, as charged, on seventeen of the nineteen counts in the information, and suspending him from the practice for a period of one year, with leave to apply for reinstatement at the expiration of that time, conditioned upon future good conduct, and making restitution to certain of the complainants.

By stipulation the case was submitted in the trial court, without arguments or briefs, solely on the evidence adduced before the Bar Committee of the 16th Circuit at its several hearings preliminary to the filing of the formal accusation. Nearly sixty pages of the abstract were required to set forth the trial court's findings of fact, with which findings, upon a careful and laborious examination of the evidence, we are in thorough accord. It would serve no useful purpose to summarize the facts as to each particular charge. Those involving embezzlement and misappropriation of his clients' funds (fourteen in number, and recent as to date) are so nearly uniform in pattern and so often repeated as to justify the conclusion that the practice amounted to custom or routine. In brief, the modus operandi was this: A matter involving the recovery of money would be entrusted to appellant in his professional capacity; the funds thus sought would come into his possession; he would deposit them in his own bank account, and use the same for his own purposes, and thereafter deceive his client, over long periods of time, by falsely and fraudulently representing that the matter was being diligently prosecuted, but he had not been able to effect collection. In such situation, if a client became too impatient or persistent, he would pay over a portion of the money—frequently by checks which were subsequently dishonored. Some of his clients found it necessary to employ other counsel and resort to suit to recover funds so embezzled or misappropriated. The following are typical examples, and for present purposes will suffice:

Count 13 relates to certain dealings of appellant as attorney for Prof. Phillip B. Perry, an aged teacher who lived in Kansas City. Prof. Perry was Administrator of the estate of his sister, Kate P. Gregg, who died in Massachusetts. The estate was administered through the Probate Court of Jackson County, of which county deceased was a legal resident at the time of her death. Among her effects were passbooks indicating she had on deposit with certain Massachusetts banks substantial sums of money, to-wit: In the State Street Trust Co., of Boston, $1,907.72; in Boulevard Trust Co., of Brookline, $10,699.35. This was confirmed by correspondence between appellant and those institutions. In May, 1934, having collected the sum on deposit with State Street Trust Co., (less certain deductions

for taxes, etc.) appellant remitted the same to Prof. Perry. But he had theretofore received from Boulevard Trust Co., its draft dated April 25, 1934, payable to the order of Kate P. Gregg, Phillip B. Perry, Administrator, for the sum of $10,699.35. It was admittedly endorsed by appellant in the name of the payees to which he appended the endorsement of his firm, "German & German." The draft was cleared through Commerce Trust Co., whose endorsement is dated April 28, 1934, and was paid April 30, 1934, by First National Bank of Boston, on which it was drawn: Prof. Perry did not authorize the endorsement, nor have knowledge either of the existence of said draft, or that the full amount of said deposit had been collected by appellant until a year later. His statement was to the further effect that on or about June 4, 1934, appellant called at his hotel, and delivered to him a check of German & German for $2500, stating at the time that Massachusetts law forbade savings banks to pay more than $2500 a month outside the state, but that the bank had agreed to pay the full amount in such monthly installments. Later, although no suit had ever been filed, he told his client the bank "had appealed the case." Prof. Perry made repeated requests of appellant throughout a period of nearly one year, but each time he was told by German that he had not heard anything further from the Massachusetts bank. Finally, about April 1, 1935, after being unable to get satisfaction from appellant, he employed the firm of Ryland, Stinson, Mag and Thomson for that purpose. Mr. Roy B. Thomson, of that firm, after corresponding with the bank in Boston, and obtaining a photostatic copy of the draft hereinabove described, called on appellant at his office. What happened in that interview is revealing, and is shown by the following excerpts from Mr. Thomson's testimony:

"I told him [appellant] in effect that I had been employed by Professor Philip Perry and that there were matters connected with the Kate P. Gregg estate that I desired to discuss with him; that there seemed to have been a substantial amount on deposit in an eastern bank and that that sum had not been received by Professor Perry. Mr. German said, in effect, that there were difficulties under the laws of the state of Massachusetts in the withdrawal of funds from the state under the circumstances which existed in this matter; that he had local attorneys there and that they were doing all they could in connection with the procuring of the funds transferred to Kansas City in this estate. I then said, in effect, 'Well, what is the present status of those negotiations,' and he said that he would have to refer to his file on that as to just the last steps taken but that the matter was in process of adjustment and proceedings were being had looking to a transfer of the funds to Kansas City. 'Well, now,' I said, 'while I am here, Mr. German, you just better get your files and see in detail the present status of this matter because Professor Perry is dissatisfied

862

and I want a report with some definiteness about it.' Well, he said he could not go into that at the time but that he would do that and would advise me. 'Well, now,' I said, 'Is there anything further in connection with the matter that you desire to discuss about it,' and he said, 'Well, no. I don't recall the details of it but that in general is the way the matter stands.' I then said in effect, 'Now, we might just as well stop kidding ourselves about this and get down to facts,' and withdrew either from my pocket or my brief case this photostatic copy of this check and I said, 'You look at that and see if that is not your signature on there.' He said, 'Well, I don't recall about it,' and he seemed to have been somewhat disturbed. 'Well,' I said, 'I am here to get this thing brought to a definite conclusion. Now, if you have files or there is anything you want to find out about it, you go ahead and find out about it while I am here. I want to know whether that is your endorsement on that check and if it is, I want to know where the money is. If it isn't your endorsement, I want to know that so I can see who endorsed this check and got this money.' 'Well,' he said, 'I will have to get into my files about that and I will let you know about it.' That was, as I recall, in the morning. 'Well,' I said, 'That is entirely satisfactory to me but I will be back here at two o'clock to find out what the facts are because I am not going to let this matter stand until I am acquainted with the facts.' Well, I went back that afternoon. He was not there. I waited a while and, as I recall, I left and whether I went back over later that day, I don't know, but somewhat later, either that day or very shortly following, George German and his brother, I think Charles, Junior, came to see me. I didn't make towards them any charges or anything else, but George did most of the talking and George said, 'We want to get this matter adjusted.' 'All right,' I said, 'There is just one way of adjusting it and that is paying this money.' Well, he said that is what he and his brother were undertaking to do and he wanted to know if I would give him a little time and I said, 'Yes, I will give you a little time but I am not going to let it go without dates. I will give you until a specified time to do whatever you want to do and that is going to be short,' and he said that he would deposit with me some kind of stock as collateral security. 'Well,' I said, 'You can leave the stock here but I won't hold it technically as collateral security for payment of this money, but you can leave it here if you want to.' Well, he left me some kind of a stock certificate and from then on George German was fully cooperative in undertaking to get this money. I understood—maybe not from a direct statement from him but from a conversation with him—that he or his father or both of them were getting the money to pay the amount of this check from a settlement of fees in an oil cracking process suit. It was necessary, as I understood, for one or both of them to go out of town from time to time as the matter was pending outside Kansas City. Well, this

went along for a short while; I was convinced that George and his brother were doing everything that they could do and that they were going to do it effectively and so I was cooperative too and that resulted in a very short while, maybe two or three weeks after that, in the payment of the full amount of this check with interest from the time the check was cashed and with a deduction of some $250 or $300 because of a fee that he said they were entitled to and I think the cost of a publication fee of $6. Whatever the deduction was, I fully approved of and received from him—

"Q. (Interrupting) That is from George? A. I think it was handled through George. I never saw Mr. C. W. German in the transaction after the first conversation with him. George and his brother sometimes came together and sometimes George came alone to my office. That resulted in, as I say the payment of the amount in full, less deductions which I fully approved of.

"Q. And plus interest? A. Plus interest . . .

"Q. Did Mr. George German or Mr. Charles Z. German ever make any excuses or explanation or any statements about why this had happened? A. No; I don't recall that either did. I didn't undertake to cross examine either of them about it. I was looking for a solution and I was pressing for a solution vigorously, but I was not undertaking to get any further commitments from them as to the previous manner of handling it.

"Q. Mr. German's statement to you on the occasion of your first, and, I assume, only interview with him in this matter—I refer to Mr. Charles W. German—was to the effect that they were having difficulty in obtaining this money, and was interpreted by you to mean they had not yet received the money? A. That is what I understood the purport of the conversation before I exhibited the photostatic copy of the check."

It is impossible to reconcile the statements and demeanor of appellant, as reflected by the foregoing, with his present contention that he endorsed the draft at the special instance and request of Prof. Perry, at the very time it was received, and that he retained and invested the proceeds thereof at the direction and with the express consent and approval of Prof. Perry. The latter claim is further aggravated by his explanation of the reason for so doing, i. e., that he joined with his client in secreting or withholding information from the probate court of the existence of the Massachusetts assets in order to avoid payment of taxes thereon. It is apparent that the excuse offered is as devastating as the pretense under which he claims to have had the right to use the money.

We take next a transaction inconsequential in amount but of relatively great importance to appellant's client, Betty Mosby, an elderly, single woman. She had been employed intermittently as a maid in the German home for more than forty years. In fact, she

served his wedding breakfast. Following the death of her mother in December, 1936, she was in ill health and desired to surrender a policy of insurance issued by Metropolitan Life Insurance Co., on the life of her brother, and receive the cash surrender value thereof. She had paid the premiums for more than twenty-five years. She consulted appellant about the matter and turned the same over to him, with instructions there was to be "no lawsuit, but just get the value of the policy, is all I want." In February, 1937, she received by mail a check from the insurance company for $87.95 payable to herself and brother. On the evening she received the check, appellant's son, George (who, although not admitted to the bar, was associated with his father in the latter's office), called at Betty's home. She was ill and confined to her bed. Upon inspecting the check, George procured her endorsement, and took the check under the representation it would be necessary for him to have the brother's endorsement. He departed with the check. Thereafter Betty made repeated efforts to get the money from appellant who, on one pretext or another, was successful in putting her off. She called at his office both by 'phone and in person, but was unable to get satisfaction. She testified before the Bar Committee in May, 1938, and at that time was still making efforts to get her money. Shortly before she testified she went to the office of the insurance company, and found appellant had cashed the check. When she confronted him with this fact, he denied it. It was not until May 27, 1938, and after testifying before the Bar Committee that he finally disgorged. He offered no satisfactory explanation of his conduct other than to say there had been "some delay."

To emphasize the regularity of the pattern referred to in the beginning of this opinion, we set forth one other example which, with the conclusion reached, is taken from the trial court's findings, as follows:

"Count 4 charges that in June, 1937, respondent, as agent and attorney for one Myrtle Rose, did by virtue of such employment receive check No. 43,149, in favor of 'Myrtle Rose or L. G. Taylor' for $416.80, covering withdrawal value of Certificate No. AP6782, issued by Farm and Home Savings and Loan Association of Missouri, which was then and there the personal property of said Myrtle Rose, of the value of $416.80, without the knowledge or consent of Myrtle Rose.

"When called before the Bar Committee Myrtle Rose testified, and the undisputed facts are, that she has been employed in Kansas City as a maid for more than thirty years; has known respondent for the twenty-seven years that she was employed at one place; that for those twenty-seven years she worked for Dr. Lynn Gregory Taylor; that respondent was a close friend of Doctor Taylor's and was at Doctor Taylor's home for dinner two or three times a week. Doctor Taylor died in March, 1937.

"Now, at the time of Doctor Taylor's death this faithful negress,

Myrtle Rose, had savings of $416.80 in Farm and Home Savings and Loan Association. The certificate for this was payable to 'L. G. Taylor or Myrtle Rose.' Myrtle Rose, when asked if she delivered the certificate to respondent, said: 'No, Mr. German took the certificate out of the bank. Doctor Taylor had it down at the safe deposit box at Traders Gate City Bank. I come over to the Farm and Home to see about it, where they were at, after Doctor Taylor died, because I didn't know where they were at, and he told me they were in Doctor Taylor's safe deposit box, and I went over there and asked Mr. Day and them about it and they said no, Mr. German had taken everything out of it, and I left the bank and went over to Mr. German and he tried to make me believe they wasn't there and he didn't have it and didn't know anything about it' . . . 'and he has got everything.'

"It is undisputed that all respondent had to do to get this money was to forward the certificate or certificates to Nevada, Missouri, which he did on May 29, 1937, and on June 1, 1937, was mailed check No. 43,149, in favor of Myrtle Rose or L. G. Taylor for $416.80, covering withdrawal value of Certificate AP6782, said check signed by Farm and Home Savings and Loan Association.

"Respondent had previously got complainant Rose to sign the certificate and later got her to come down and sign the aforesaid check, telling her he had to go down to Nevada and had to take the check back because Doctor Taylor's name was signed to it and she couldn't use it that way. After two or three weeks Myrtle approached respondent for her money and subterfuge was resorted to until sometime later, as Myrtle says, 'George German was sent out to me with a check for $25.00. Well, the check bounced back.' George German later took Myrtle $15 in cash and took back the $25 check, and the witness says: 'They tell me I should have kept that check.' By July, 1938, she had only succeeded in getting $98 from respondent and could get no more until she employed a lawyer to collect from her lawyer. This lawyer succeeded in collecting $225 more before despairing, and charged her $100 out of that sum. She then turned the matter over to another lawyer who gave up without getting any further results. Respondent admits collecting all of this money June 1, 1937. He is evasive with the Bar Committee—foolishly so, first saying when asked about what happened to the check: 'I think that was endorsed by Myrtle Rose and paid through the bank in due time.'

"The following colloquy took place:

" 'Q. Did you deposit this in your account? A. I don't know—probably I did.

" 'Q. What happened to the money after you made the deposit? A. Well, from time to time it was paid out to Myrtle Rose.

" 'Q. Why was it paid out from time to time? A. Because that is the way she wanted it done and that is the way Doctor Taylor wanted it done.'

"The foregoing shameless sophistry in the face of the fact that Myrtle Rose was compelled to employ another lawyer at an expense of $100 to get $225 of her $416.80 and in the face of respondent's admission that after this lawyer gave up he still owes her some small sum and the admission he was to make her no fee charge whatever. The small sum he admits being due to Myrtle Rose of her original sum is in any event at least one-fourth of the original sum and more than one-third of what she has realized out of the amount to which she is entitled.

"It is concluded from the foregoing facts that respondent is guilty of the grossest professional misconduct in mistreating the faithful negro maid, for twenty-seven years the employee of his deceased friend —in imposing upon the confidence of said Myrtle Rose in the hour of her greatest need when she had lost her old friend and employer, and was worried and out of work; and putting her to great expense in getting any part of the amount due her."

It will be recalled that the case was not tried in the usual way, but rather on evidence heard before the Bar Committee during its investigation of appellant's conduct, and prior to the filing of the information or charge. The array of former clients who appeared before the committee as complaining witnesses was formidable. Notwithstanding repeated offers made by the committee, appellant steadfastly declined to be confronted by his former clients and cross-examine them. In the light of all the facts of the case this is, perhaps, understandable.

It would unduly extend this opinion to enumerate the many instances of gross professional misconduct in his relations with clients. Likewise his dealings with former partners upon and following dissolution of the two law firms of which he was a member were marked by lapses equally reprehensible and inexcusable. The evidence is so overwhelming and conclusive as to admit of no finding other than that of guilt. Appellant has lived and practiced his profession in Kansas City since graduation from law school in the early 1890's, when he became a naturalized citizen of the United States. For a long, long time, and until comparatively recent years, he was regarded as one of the leaders of the bar, the recipient of certain professional honors; he was for many years a member of one of the oldest, largest and most highly respected law firms in the city, and, subsequently in partnership with an ethical and distinguished young lawyer, now deceased. So we are not dealing with youth and inexperience, nor with isolated instances of departure from recognized standards of propriety.

Our only point of difference with the trial court is in relation to the extent of the discipline to be imposed. The able judge who tried the case was confronted, as we are, with a distasteful and onerous duty involving a high degree of responsibility not only to the accused, but to the profession and public as well. We recognize that the condi-

tions imposed as prerequisites to reinstatement after the period of suspension virtually amount to disbarment because the likelihood of their performance is remote. But upon a consideration of all the facts and circumstances surrounding the case, we are impelled to the view that outright and permanent disbarment should be ordered; and to that end, the judgment, insofar as it finds appellant guilty of the charges specified, should be, and it is affirmed, and the cause remanded with directions to strike appellant's name from the roll of attorneys, and that he be disbarred. All concur.