SCHOOLFIELD et al. v. BEAN et al.—167 S. W. (2d) 359.

Middle Section. September 23, 1942.

Petition for Certiorari denied by Supreme Court, January 9, 1943.

J. Clifford Curry, Silas Williams, and Joseph B. Roberts, all of Chattanooga, for appellants.

S. F. Fowler, of Knoxville, amicus curiae.

Walter M. Haynes, of Winchester, for appellees.

KETCHUM, J. This is a disbarment proceeding instituted by the Grievance Committee of the Chattanooga

Bar Association against the defendants Crawford Bean and Joe S. Bean, members of the Chattanooga Bar engaged in the practice of law as partners under the firm name and style of Bean & Bean. In the petition the defendants are charged with the violation of the ethics of the profession of the practice of law in seeking out persons having claims for personal injury or other causes of action for the purpose of obtaining employment by such claimants, and in employing agents or runners for such purposes, and paying or rewarding, directly or indirectly, those who might bring, or influence the bringing, of such cases to them or their office. And the petition particularly charges the defendants, and each of them, with the violation of the provisions of section 1, subsections (2) and (5) of chapter 42 of the Acts of 1919, which are carried into the Code as section 9974, subsections (2) and (5), which reads as follows:

"Any attorney, solicitor or counselor at law admitted to practice in the courts of this state may be disbarred or suspended from the practice of law—. . .

"(2) Who shall seek out any person having a claim for personal injury, or having any other ground of action, in order to obtain employment by such claimant, or shall employ agents or runners for like purposes, or pay or reward, directly or indirectly, those who bring, or influence the bringing, of such cases to him or his office. . . .

"(5) Who shall be guilty of any unprofessional conduct, dishonesty, malpractice, or any conduct which renders him unfit to be a member of the bar."

The petition specified in some detail 27 separate instances in which the defendants had violated the above statutes by either personally, or by their agents or runners, soliciting employment by persons having claims for damages for personal injuries sustained by them-

selves, or for the wrongful death of members of their families; and alleged that the defendants had solicited, either personally or through their agents, employment in numerous other instances, as would be shown on the hearing of the cause.

The defendants in their answer denied that they had been guilty of the violation of the statutes pleaded, or had been guilty of any of the acts of unprofessional conduct charged against them in the petition; and alleged that said unwarranted charges were inspired and actuated by petty jealousies and factional politics, or based on false information furnished to petitioners by persons who were hostile to the defendants; they emphatically deny that they have either personally or through the agency of runners solicited employment in any personal injury cases, or that they have ever engaged or employed any agents or runners to solicit business of any kind for them. They aver that they have at all times sought to maintain the highest standards of their profession and to uphold the dignity and purity of both Bench and Bar; that they have always endeavored to be courteous and honorable in their dealings with their professional brethren, and have always dealt fairly and honorably with their clients; and attribute such success as they have attained to the strict adherence to this policy.

The defendants further aver that since the filing of the petition against them they have investigated and learned that the Association of Casualty and Surety Executives had employed one Morgan Wood, who posed as a member of the Federal Bureau of Investigation, to investigate the charges against the defendants, and that the said Wood had by co-ercion, intimidation and bribery obtained false statements from some of their former clients, which statements were used as the basis of the

false charges made against them. And they aver ''that this undertaking is a pure and unadulterated frame-up on the part of certain venomous enemies of the defendants who have imparted the grossly false information to petitioners upon which the charges were based.''

The investigation was prompted at the outset by what the defendant Crawford Bean describes as a ''big wrangle'' which occurred in Judge Fred W. Ballard's court (circuit court) over the right of the defendants to prosecute a suit which they had brought for a negro boy named Charlie Watts Mitchell for damages for personal injuries sustained in an automobile accident. Shortly after the filing of this suit another firm, Wood & Dietzen, filed an affidavit of the said Charlie Watts Mitchell in which he swore that the defendants had solicited the case and that he had not signed the summons (meaning the pauper's oath); and as the result of this wrangle Judge Ballard referred the matter to the Grievance Committee of the Bar Association for investigation of the charges of solicitation of business made against the defendants. The Grievance Committee after an investigation of the facts reached the conclusion that the facts warranted a judicial investigation of the charges and they filed the petition in the instant case. Judge Ballard, out of a sense of delicacy, because he felt that he would probably be called as a witness in the case, recused himself. Thereupon, the Honorable Grafton Green, Chief Justice of the Supreme Court, designated the Honorable Wallace J. Smith, Judge of the 17th Judicial Circuit, to hear and determine the case.

The case was heard by the court on oral testimony, but not as a chancery case. The trial was begun on June 23, 1941, and was finally concluded on July 3. There were 134 witnesses examined in all and the record is a volum-

inous one. The trial judge filed his written opinion and finding of facts on August 2, in which he found that the defendants had been guilty of 20 of the charges of soliciting employment specified in the petition, "and had been guilty of such acts of unprofessional conduct as are violative of the statute, and inconsistent with the character and faithful discharge of the duties of the profession" for which they and each of them should be suspended or deprived of the right to practice law for a period of one year. The defendants filed a motion for a new trial on August 7, but subsequently withdrew it; the petitioners also filed a motion for a new trial on August 29, 1941, upon the ground that the period of suspension was wholly inadequate and incommensurate with the seriousness of the offense of which the defendants had been adjudged guilty. The defendants thereafter on September 19, 1941 (which was at a subsequent term of court which began on September 1, 1941), filed another motion for a new trial which was in all respects identical with that which had been originally filed and withdrawn except that it added one additional ground.

The petitioners on September 19, filed their motion to strike the defendants' motion for a new trial because it was filed too late, and at a term of court subsequent to the term at which the cause had been heard and disposed of. On October 17, 1941, the cause was heard upon the petitioner's motion for a new trial, and upon their motion to strike that of the defendants; whereupon the defendants again asked leave to withdraw their motion, which leave was granted; and the court overruled the petitioners' motion for a new trial, and adjudged that the period of suspension of the defendants did not become effective until the date of the withdrawal of their second motion for a new trial, to-wit, October 17, 1941, and decreed that

the defendants would be suspended and deprived of their license to practice law in any of the courts of Tennessee for a period of one year from that date.

The petitioners excepted to the ruling of the court in overruling their motion for a new trial, and prayed and were granted an appeal to the next term of the supreme court, and upon motion there made the cause was transferred to the court of appeals at Knoxville, and that court of its own motion transferred it to the middle division of the court to be heard at Nashville.

■ On this appeal the findings of fact of the trial judge must be regarded as amply sustained by the proof, the defendants having waived any objections thereto by their voluntary withdrawal of their motions for a new trial. The assignments of error raise the single question that the period of suspension was entirely inadequate and incommensurate with the seriousness of the charges of which the defendants were found to be guilty; or, to state it differently, that the trial judge failed to exercise a reasonable discretion in fixing so light a punishment in view of the gravity of the charges of which the defendants were adjudged to be guilty.

We concur in the finding of the trial court that "The record shows many instances in which undertakers, ambulance drivers and cab drivers have called the defendants, or one of them, and taken them to hospitals or homes, at practically all hours of the day and night, and in many instances these interested friends of the defendants have appeared at hospitals before patients were taken from the emergency room, and at times when the victims of disaster were in no condition, mentally or physically, to resist the efforts of anyone promising relief".

And again that "The circumstances surrounding the many cases in which they were employed through the

efforts of Foster Stubblefield, an ex-convict, E. J. Harris, ambulance driver, A. G. King, negro school teacher and cab driver, James E. Turner, undertaker, Hal Franklin, ambulance driver, Harold Lucas and others, is so strong and convincing that it excludes every reasonable hypothesis but the hypothesis of the guilt of the defendants''.

The defendants in their testimony as well as in their answer emphatically denied that these persons were employed by them as ''runners'' or ''pikers'' to solicit business for them, and say that they were friends or clients who merely recommended them to such victims of disaster as they came in contact with in the usual course of their business as ambulance drivers, cab drivers and undertakers. And they point to the fact that the petitioners have offered no proof that they have paid or otherwise rewarded such persons for recommending them to persons who had been injured in accidents, as indicating that such persons were not soliciting business for them.

The overwhelming weight of the evidence is against this contention of the defendants. The zeal of these friends in the interest of the defendants in seeking out persons who had been injured in automobile and bus accidents, in recommending defendants to them as fine lawyers, and in notifying the defendants and bringing about an introduction, was entirely too great; and the diligence of the defendants in going with them to see the victims at the hospitals or at home, at all hours of the day or night, and getting contracts and pauper's oaths signed up, evidences a definite plan or system for soliciting business for the defendants.

The defendants say in their answer that some of their friends have ''been over-zealous, and all have been gracious and generous in referring prospective litigants in this vicinity to them, for which defendants are properly

grateful''. These recommendations came too frequently, and the eagerness of the "friends" in notifying the defendants and in bringing them into contact with the "prospective litigants" was entirely too great for it to have occurred in the normal course of a lawyer's practice.

For instance, Foster Stubblefield, who was familiarly known to the defendants as "Stubb", was the contact man in 11 cases. He was an ex-convict and had served terms for highway robbery in the penitentiary in Illinois and Tennessee, and had been rendered infamous. After his release from the penitentiary in Tennessee in 1932 he returned to Chattanooga, and was frequently seen in and about the office of defendants. The explanation given for this was that he came from the same rural section of Franklin County from which the ·defendants came and they had been friends since their boyhood. Both of the defendants "helped him out" in different ways, both donated money to help him defray his expenses to Hot Springs when his health had become impaired. Crawford Bean had "done him quite a few favors", including endorsement of his note at the bank, and had set him up in the restaurant business; he says of him that "he is a loyal friend of whom I have never known anything crooked". The defendant Joe Bean says of him that "he is loyal to his friends and will go out of his way to accommodate a man", and that "he gave away a lot of beer out there" (in the White Oak community) when Joe was a candidate for the Legislature. He was active in Joe's behalf in his different political campaigns, and Joe reciprocated by writing letters of recommendation for him in which he spoke highly of him, and he filed a petition for him to have his citizensip restored. And Joe admits that he made no mention of his criminal record in his letters of recommendation, and that he withheld

from the court the fact that he had been arrested on a charge of highway robbery, but was released, and had been convicted of lesser criminal offenses, since his discharge from the penitentiary in 1932.

In making his approach to persons who had been injured Stubblefield would represent that he had witnessed the accident or had been in a similar accident, or that he knew some eyewitness to the accident, and would recommend Bean & Bean as fine lawyers. He would then report promptly to one of the Beans and would go with him to see the injured party.

Although his citizenship had been restored and his disability of infamy removed the defendants did not introduce him as a witness to prove that he had not solicited business for them.

The E. J. Harris (also known as Jonah Harris), who was mentioned by the trial judge as one of the runners for the defendants, was an ambulance driver for the R. J. Coulter Company, an undertaking establishment, in January, 1939, when a boy named James Nash was injured by a truck. Harris took the boy and his mother to the Childrens' Hospital, and on the way to the hospital he recommended the defendant Crawford Bean as a good lawyer and offered to have him see her; at about six-thirty on the same evening he took Mrs. Nash and her son home in the ambulance and again told her that he would send Mr. Bean to see her. About half an hour later he returned with the defendant Crawford Bean, who talked with her about the accident and left with her a page of a calendar for January, 1939, on which was written "Bean & Bean, 409 Chattanooga Bank Building, Phone 6-4134, Crawford Bean", which paper Mrs. Nash filed as an exhibit to her testimony. Mrs. Nash had never heard of Bean & Bean before. Shortly after this she signed some papers

for defendants and they filed suit for her son. Jonah Harris testified that he had recommended the defendants in other cases but had no idea how many.

The A. G. King referred to by the trial judge was 'a graduate of Fisk University, and while there he was one of the famous Fisk Jubilee Singers. He became acquainted with the defendants soon after they came to Chattanooga to practice law, and he felt obligated to them because their father had helped him get a scholarship at Fisk University. He was a school teacher by profession and operated a taxicab on the side.

In October, 1940, Cora Phillips and Nellie English were hurt in a bus accident and were taken to Erlanger Hospital where they received first aid treatment. As they were leaving the hospital King asked Nellie English if he might take them home in his taxicab. They went first to the home of Cora Phillips and she got out there; on the way to the home of Nellie English he asked her how the accident occurred, recommended Crawford Bean as a good lawyer, and offered to have him come to see her; and later that night he brought Crawford Bean to see her. He went in to see her while she was in bed and had her sign a contract and pauper's oath, and later brought suit for her.

At about nine o'clock that same night two men went to the home of Cora Phillips, and one went in and asked to see her, but her husband John Phillips told him that she was suffering and was very nervous, and he would not allow her to be disturbed so this man left Bean & Bean's card and told him to call them if they needed a lawyer. John did not know the Beans and did not call them. The other man, who was a white man, sat in the taxicab in front of the house until the driver came out. Crawford Bean denies any knowledge of this incident. Nellie Eng-

lish and Cora Phillips were both hurt in the same accident and left the hospital together in King's taxicab, but had not known each other prior to the accident.

J. E. Turner, commonly known as "Bookie" Turner, an undertaker, was the contact man in at least four cases and admits that he recommended the defendants in other cases; and he says "I could not say how many cases there were I have been successful in helping them get", or how many cases he had referred to them.

Bookie was coroner for Hamilton County and gives the defendant, Joe Bean, who was influential in politics, credit for securing his election; and by way of explanation for his activity in referring accident cases to the defendants, he said "When a man scratches my back I will scratch his."

Bookie was diligent in making contact with prospective clients for the defendants. Pete Massengale's boy, Billy, was fatally injured in an automobile accident on the 25th day of June, 1940, and was taken to Erlanger Hospital. Bookie learned of the accident and ran into Pete at the hospital that afternoon. He recommended the Beans and tried without success for an hour and a half to locate them. He finally got in touch with Crawford Bean, made an engagement with him to come to the hospital at seven thirty o'clock that evening, met him when he came, and then went to look for Pete. When he found Pete he told him that Murrell Phipps, a neighbor was looking for him and went with him to find Phipps; instead, however, they found Crawford Bean who was in his car parked in the street. After Crawford had gotten the contract signed up he took Pete's wife and boy home and returned to the hospital and picked up Massengale and Bookie Turner and they went together to scene of the

accident, examined the skid marks, made measurements, etc.

James Sutton was killed by a switch engine at eight forty o'clock one Saturday night and his body was taken to the Page-Hancock Funeral Home. Bookie wanted to bury him. He got in touch with Mrs. Sutton's brother after ten-thirty o'clock and asked him to go with him to see Mrs. Sutton, and they reached her home after midnight. Bookie told her that he would furnish him a nice funeral and asked about the insurance, and she told him that her husband had just taken out some insurance and had paid four weekly payments on it, but had not received the policy. Bookie then called up Crawford Bean and asked his advice about the insurance and Crawford advised him that under those circumstances he thought the company would pay the amount of the insurance, and upon this advice Bookie agreed to bury the deceased, and had the body removed that night from the Page-Hancock Funeral Home to his own establishment. And he suggested to her that night that she use his lawyers. On the following morning, which was Sunday, Mrs. Sutton and her mother went to Turner's funeral home to select the casket and burial robes and before she had made the selection, Crawford Bean came in. Bookie introduced him and he obtained a contract before the casket was selected.

E. J. Kyser was involved in an automobile accident at 6th and Market Streets in Chattanooga and Bookie "discussed it with a man". Later Kyser called him and asked him if he had witnessed the accident. Bookie went to Kyser's boarding house to see him, phoned Joe Bean several times from there, and waited there for two and a half hours for Joe to come, but when Joe got there he found that Kyser had already talked with and employed

a Mr. Townsend, a lawyer who came from Kyser's home town; and Joe did not get a contract.

On February 18, 1940, Mrs. Mary Lee and her daughter Mrs. F. A. Miller were hurt in a bus accident, and were taken to the Physicians & Surgeons Hospital for first aid treatment. Bookie got in touch with them there and took them to the home of Mrs. Lee's brother-in-law, Mr. Miller. He says he asked her to use a lawyer friend of his, and offered to bring him to see her. He tried to get Joe, but finally got Crawford. Joe called him after ten-thirty that night and Bookie told him he thought it best for him to see her that night so they went out to see them around midnight, after the family had all gone to bed. Mrs. Lee signed a contract but Mrs. Miller did not because she was not badly hurt and did not want to have a lawsuit. She testified that Joe insisted upon her bringing suit, and told her that she should not go to work the next day because she might be hurt worse than she thought she was. Joe denies, however, that he suggested that she should exaggerate her injuries.

Harold Lucas, a brother-in-law of Bookie Turner, and manager of the Read House Liquor Store, was another friend of the defendants who was instrumental in bringing cases to them. In January, 1937, he came upon the scene of an automobile accident and upon inquiry learned that Mrs. Leona Cahoon, whom he knew, had been injured and that she had been taken to the Newell & Newell Sanitarium. He went at once to the Sanitarium to see if he could be of any help, and went in and talked to Mrs. Cahoon while she was still in the emergency operating room, and he says that she asked him about getting a lawyer and that he recommended Joe Bean; he says she recalled that she knew Joe and requested him to get in touch with Joe and ask him to come up there; that she

also told him that James Sanders was hurt in the same accident and asked him to see Sanders. On this same occasion he went to see Mrs. Carter (who was injured in the same accident), in her room at the hospital, told her that the owner of the car had insurance, and that she could get good damages. It so happened that Mrs. Carter was the owner and driver of the car, and she says she "bawled him out" and ordered him out of the room. Lucas went to see Sanders in his room at the Ford Hotel on the following morning and told him that Mrs. Cahoon was going to employ Joe Bean and wanted him to employ the same lawyer. He got in touch with Joe on the morning after the accident and took him to see Mrs. Cahoon and Sanders, and Joe got their contracts.

Lucas also tried to get the case of the Blackwell child, who was killed on the Lee Highway, for the defendants, and took the father of the child up to the defendants' office but they did not get that case.

Lucas testified before the Grievance Committee, and in answer to a question whether he had solicited cases for the defendants, said: "Well,. I don't know what you might call soliciting cases. I have had friends of mine who would have an accident, and I have got them to represent them. I guess you would call it solicitation."

Dr. A. V.. Avakian and Dr. Doyle Curry, Murrell Phipps, a constable who lived at Hixson, Tony Kaplan, operator of the Venice Cafe, Percy Buchanan, a negro undertaker, and Lewis Brown, his assistant, Harold Franklin, a negro ambulance driver for the Mabel Franklin Funeral Home, and others, were active in referring persons injured in automobile accidents to the defendants, in promptly notifying the defendants, and in going with them at all hours of the day and night to see the victims, and in aiding in the discovery of the evidence.

All of these persons showed more than a casual interest in seeing that the defendants were employed to represent the injured persons in their damage suits. Harold Franklin made the contact in the Charlie Watts Mitchell case, and went with Joe Bean out to Turkey Foot, 12 or 14 miles from Chattanooga, on the morning after the accident to get Charlie's mother and bring her in to the hospital.

Percy Buchanan made the contact in the Ishmael Gates case. Ishmael's so-called ''common law wife'' was killed in an automobile accident. He did not have the money to bury her and Crawford Bean went on his note at the bank for $200 for her funeral expenses. He had Ishmael appointed administrator and brought suit for him, but later the real husband showed up and filed a petition to have Ishmael removed as administrator. Crawford then retired from the case.

This shows the manner in which some 30 odd cases came into the office of the defendants. The defendants say that the plaintiffs were referred to them by their friends but we have set out the facts at this great length to show that these clients were obtained by the systematic solicitation of these ambulance drivers, cab drivers, undertakers and others, both black and white, and that their activities were carried on with the full knowledge and acquiescence of the defendants. And it was largely through the activity of these friends that during the period from January 1, 1937, to April 1, 1941, the defendants filed 714 cases in the circuit court of Hamilton County, about one-half of which were damage suits and the other half divorce cases. There were 8203 cases in all filed in that period in said court which left about 7500 cases filed in said court by 350 to 400 other lawyers residing in Hamilton County. In some years the defend-

ants filed far more than 10% of all cases filed in said court. During the period from January 1, 1937, to December 31, 1940, they filed 299 bankruptcy petitions out of a total of 2371 petitions filed in the U. S. District Court, which is composed of ten counties, or far more than 10% of the total number of petitions filed, and in the years 1937 and 1938 they filed more than 15% of the total filed.

The defendants were born in a rural section of Franklin County known as Sinking Cove. They received their early education in the county schools of that county and in the high school at Winchester. They then went to the University of the South where they worked their way through college. After graduating there they studied law at Cumberland University, and after finishing there they took the State Bar examination and were admitted to the Bar, Crawford in 1930 and Joe in 1932. Crawford Bean at once opened a law office in Chattanooga and when his brother was admitted to the bar he went into Crawford's office on a salary and later they became partners. Joe was always interested in politics and was elected to the Legislature in 1934, was a candidate for the state senate in 1936, was defeated, but ran again in 1938 and was elected.

In his races for the senate the point was made that he was under 30 years of age, the age required by the constitution, but he claimed that he was more than 30 years of age and eligible to hold the office. On this trial certain records of the University of the South were introduced in evidence that strongly indicate that this claim was false and that he was not eligible. His application for admission to the University in 1927 gives his age as 18, which would fix the year of his birth as 1909. His matriculation card for that year purports to give the date of his

birth as March 14, 1906, but there is unmistakable evidence of the alteration of this card, showing the erasure of some other figure and the insertion of the figure "6" in the 1906. His matriculation cards for the years 1928 and 1930 give the date of his birth as March 14, 1909; and Crawford Bean's matriculation card dated September 15, 1925, gives the date of his birth as March 1, 1906. Joe Bean's explanation of this is that his parents were illiterate and had no record of the date of his birth, and that he had never known positively in what year he was born. But it is not claimed that there was ever any doubt about the date of Crawford's birth, and it is, of course, impossible for both of them to have been born in March 1906, and two weeks apart. Undoubtedly their parents must have known and they themselves must have known whether Crawford was one year, two years or three years older than Joe. This is of importance here only as tending to impeach the testimony of the defendant Joe Bean.

Joe Bean has been active in all the political campaigns of Hamilton County since 1932, and he attibutes the activity of his friends in his behalf to the fact that, they had worked with him in election campaigns, and that he had used his political influence in behalf of some of them, and to the fact that some of them had come from Franklin County and had been his boyhood friends.

Crawford Bean owned a Small Loan concern known as the Commercial Discount Company in which he continued to charge $3\frac{1}{2}\%$ per month interest after the maximum rate had been changed to $1\frac{1}{2}\%$ per month, and his employees in charge of the business were indicted for charging an illegal rate of interest. He defended them in these cases, entered a plea of guilty for Miss Hembree and paid her fine of $50, and secured an acquittal for the

other employees. He also owned a one-third interest in a similar business at Cleveland and an interest in one at Rome, Georgia. He testified that he opened the Commercial Discount Company as a hobby, put $15,000 of capital in it, but that it proved to be a losing proposition and that he finally closed it out at a loss of $5200. This concern was used in some cases, at least, as a vehicle for making loans to plaintiffs in damage suits in order to get their business.

The defendants contend that this disbarment proceeding against them was instigated by the casualty and liability insurance companies because of their success in the prosecution of damage suits in personal injury cases. They say that the Association of Casualty and Surety Executives sent a corps of five or six "skilled, experienced and highly paid detectives" to Chattanooga, at a cost of thousands of dollars, to conduct an intensive investigation for the purpose of obtaining evidence upon which charges of unprofessional conduct could be made against them. And it is contended that these so-called detectives, by bribery or offers of money, or by offers to recover for them the compensation they had paid the defendants, had obtained false affidavits from their former clients, which were used as the basis of the charges made in the petition.

This contention that this proceeding was instigated by the casualty and insurance companies of their attorneys is utterly without support in the proof. This charge is repeated many times in the brief of counsel; and although it appears from the proof that some of the petitioners are attorneys for insurance companies there is no proof whatever that any of the petitioners had anything to do with bringing about the investigation, or that the matter was referred to them because they represented insurance com-

panies. As we have already pointed out the investigation originated with the charge made by Wood & Dietzen that the defendants had solicited employment in the Charlie Mitchell case, and the matter was referred to the petitioners, not because they were attorneys for insurance companies, but because they were the duly appointed members of the Grievance Committee of the Chattanooga Bar Association. The proof shows that after the matter had been referred to them, Mr. Henson Schoolfield, the chairman of the committee, was informed by Mr. Robert M. Hunt, a member of the Chattanooga Bar, that the Association of Casualty and Surety Executives, which had an office in Atlanta, would at the request of judges or Bar Associations, aid the Grievance Committee in making an investigation. Mr. Schoolfield then discussed the matter with his committee, and Mr. Clark, who was a member of the committee, was instructed to ascertain whether said association would assist them in the investigation. Mr. Clarke telephoned to Mr. Felix O. Cox, an officer of said association at Atlanta, and was advised by him that they would send Mr. N. Morgan Woods of New Orleans, to Chattanooga, to aid the committee in making the investigation to determine whether charges of unprofessional conduct should be preferred against the defendants.

Mr. Woods is a young man 34 years of age and is regularly employed by the Association of Casualty and Surety Executives. He is a graduate of Tulane University, took the Louisiana State Bar Examination before he became of age, and was granted a license to practice law on the day he became of age. He practiced law in New Orleans until June, 1934, and in the course of his practice he was for a time an examiner of land titles for the Federal Land Bank of New Orleans. In June, 1934, he was employed by the Federal Bureau of Investigation

and held this position until March, 1935, when he was employed as an investigator by the Association of Casualty and Surety Executives, and on June 26, 1941, (which was during the trial of this case), he received notice of his promotion to the position of Special Agent in charge of the St. Louis office of the association at an increased salary. His duties with the association have been to investigate and assist law enforcement officers in the prosecution of fraudulent claims. His credentials showed that he had a good record with the Federal Bureau of Investigation, and he is now an Associate Member of Special Agents of the FBI, an organization composed of former members of the FBI who made good records there.

It is true that he was loaned to the Grievance Committee of the Chattanooga Bar Association and that his salary was paid by the Association of Casualty and Surety Executives, but his investigation was made under the direction of the Grievance Committee with whom he was in daily contact. He had other duties during the investigation sometimes requiring his presence elsewhere and he was assisted by other agents of the Association of Casualty and Surety Executives, but they all worked under the direction of Mr. Schoolfield, followed the leads that he gave, and reported to him. The affidavits and testimony of defendants' witnesses and former clients that Woods offered them money or other reward if they would sign affidavits for him are thoroughly discredited, and such a claim is tantamount to a charge that the Grievance Committee were trying to obtain false testimony against the defendants.

It is sufficient to say that we find nothing of substance in the evidence which reflects upon the character of Mr. Woods in making this investigation; and the character

and standing of the members of the committee under whose direction the investigation was made is in itself sufficient guaranty that no money was paid or offered to any one in order to obtain evidence against the defendants.

The only question involved on this appeal is whether the trial judge exercised a reasonable discretion in suspending the defendants and depriving them of the right to practice law for only one year. The petitioners contend that because of their systematic and flagrant violation of the statute the judgment should have been for their permanent disbarment. The defendants, on the other hand, contend that the matter of punishment to be imposed was in the discretion of the trial judge and that his judgment in this regard is conclusive. The test is whether the trial judge exercised a reasonable discretion, and the exercise of his discretion will not be interfered with on appeal except in case of abuse. 7 C. J. S., Attorney and Client, sec. 37, p. 801, and cases there cited.

The statute under consideration is aimed at the evil of ambulance chasing and imposes a penalty for its violation ranging from permanent disbarment to mere temporary suspension, according to the varying facts in the different cases. The trial judge is not vested with an arbitrary discretion to impose any penalty he pleases within those limits, but he should in each case endeavor to make the punishment fit the offense and impose a penalty commensurate with the seriousness of the charges of which the attorney is adjudged guilty. This is what is meant by a reasonable discretion.

In 5 Am. Jur., "Attorneys at Law," sec. 253, it is said: "The power to disbar is not an arbitrary and despotic one to be exercised on the pleasure of the court, or from passion, prejudice or personal hostility; it is the duty of

the court to exercise and regulate it by a sound and just judicial discretion, whereby the rights and independence of the bar may be as scrupulously guarded and maintained by the court as the rights and dignity of the court itself''.

■ The contention is made on behalf of the defendants that the fixing of the punishment for the violation of the statute lies within the discretion of the trial court, and that for all practical purposes his judgment in this respect is conclusive upon the appellate courts. There was at one time high authority for this view, but the better reasoning seems to be, and the authorities are now practically uniform in holding that the judgment of the trial court in this regard is reviewable to determine whether there has been an abuse of his discretion. The language of the supreme court of Connecticut in Re Durant, 80 Conn., 140, 149, 67 A., 497, 501, 10 Ann. Cas., 539, is pertinent in this connection. It is there said:

''It has been questioned by high authority whether an appeal or writ of error would lie from disbarment orders. [Citing cases.] In two cases this court has suggested a doubt upon this point. . . . Fairfield County Bar v. Taylor [supra], 60 Conn., 11, 15, 22 A., 441, 13 L. R. A., 767; In re Wescott, 66 Conn., 585, 34 A., 505.

''In Re O'Brien's Petition, 79 Conn., 46, 63 A., 777, views as to the status of an attorney at law and his rights were expressed by us which lead quite inevitably to the conclusion that in this jurisdiction, as in many others, a disbarred attorney is entitled to have the proceedings which have resulted in his being deprived of the valuable right which he had formerly enjoyed reviewed upon appeal, for some purposes, at least. [Citing cases.] This conclusion appears to us to be the only sound and safe one. The fact that the court exercises a large measure

of discretion, and is in a position to most intelligently exercise it, furnishes no obstacle to a review to ascertain, not only whether a reasonable discretion was used, but also whether the proceedings were regular and fair. We not infrequently inquire to see whether there has been an abuse of judicial discretion. Selleck v. Head, 77 Conn., 15, 17, 58 A., 224."

In the Durant case the review was granted at the instance of the disbarred attorney. In the subsequent case of Grievance Committee v. Broder, 112 Conn., 263, 269, 152 A., 292, 297, it was said that the rights of the individual attorney could not be held to be of higher consideration than that "the administration of justice may be safeguarded and the courts and public protected from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession". Citing In re Durant, supra. And on the right of the Grievance Committee to a review, the court said: "To deny an appeal to the representative of the public interests involved would leave the decision to the uncontrolled discretion of a single judge, and prevent the review of the procedure followed by him, no matter how irregular, unfair, or arbitrary to the public interest concerned. A procedure which would deny to the court and the public the right to have their interests safeguarded by the same rules of law which protect private and individual rights would be neither wise nor safe. It would be incongruous for the judges of the superior court and the Legislature to provide the special procedure for the investigation and prosecution of such complaints with intent to protect the court, the profession of the law, and the public, and then deny the right of appeal from the decision of the trial court when the public official authorized by the judges of the superior court to prosecute the complainant was of the

opinion that the decision of the trial court did not accord with the law. Neither Legislature nor judges can be charged with the institution of such a halfway measure of justice. When they approved of a procedure calling for the investigation and prosecution of such complaints, they intended that these should be carried through under the forms and rulings of our law to an ultimate determination. In no other way in these matters can justice be served.''

 We therefore hold that we have the right to review the action of the trial court to determine whether he exercised a reasonable discretion, or whether he abused his discretion, in suspending the defendants from the right to practice law for one year.

The evil of ambulance chasing has been condemned by the courts and by the profession long before the passage of the Act of 1919, supra, which expressly prohibits the practice. In Ingersoll et al. v. Coal Creek Coal Company, 117 Tenn., 263, 310, 98 S. W., 178, 190, 9 L. R. A. (N. S.), 282, 119 Am. St. Rep., 1003, 10 Ann. Cas., 829, the complainants, who were engaged in the practice of law at Knoxville, opened an office at Coal Creek immediately after a serious mine disaster near there, and by solicitation obtained contracts from persons who were injured, or from members of the families of persons who were killed, to bring suits against the company. The company afterwards made compromises with the plaintiffs in these suits and settled with them directly; and the complainants sued the company to recover their fees. The defense was that the complainants had solicited employment in said cases and were therefore not entitled recover because their contracts were illegal and against public policy. The court of chancery appeals, while severely condemning the practice as unprofessional, was

of opinion that since the Legislature had not prohibited it, the conduct of the complainants was not illegal, and upheld the decree of the chancellor in granting them relief under their contracts. The supreme court, however, on its review of the case, held that the question involved the professional conduct of the complainants in their relation to the courts and to the public in the practice of their profession, and held that the complainants were not entitled to recover. On the question we are now considering, the court say:

". . . but when such a case is presented, as is disclosed in this record, of attorneys rushing to the scene of disaster is hot haste, and competing with each other in soliciting the bereaved ones to allow them to sue for their losses, we feel that we are called upon to say in no uncertain terms that such conduct is an act of impropriety and inconsistent with the character of the profession. We cannot, we dare not, lower the standard of the legal profession to that of a mere business, in which fleetness of foot, or the celerity of the automobile, determines who shall be employed.

"The miserable victims of the disaster are dazed by the terrible bereavement. They are in no condition to consider their rights to damages. In their extremity, they fly to any one promising relief, when, if left to time and more mature consideration, they would be enabled to make, perhaps, a better choice. In addition, it is unbecoming a member of the profession, and a public scandal, and when he bases his right to recover fees upon such improper conduct, and lowering the character of the profession and the court, it is no excuse that other attorneys do the same; but this is rather a reason why this court should act promptly and decidedly, in order that an end may be put to the practice".

In this case Chandler, the special partner, went to the scene of the disaster and personally solicited such parties as had rights of action to put their claims into complainants' hands. It does not appear that he practiced any fraud or deception, or made any false representations to get cases for his firm. But it was nevertheless held that this was such unprofessional conduct as would repel the complainants in an action to recover their fees.

The petitioners in support of their motion for a new trial filed the affidavit of LeRoy Trammel, a member of the U. S. Army Air Corps stationed at Baton Rouge, Louisiana, who was not available as a witness at the time of the trial. Trammel swore in his affidavit that he was associated with the defendants from 1934 to 1938, and that during that period Foster Stubblefield and John Cummings were also associated with them and were often in and about their office; that they aided in making contacts with persons who had been injured, or with members of their families, aided in investigating accidents, searching for witnesses, and often posed as witnesses to such accidents.

The defendants moved to strike this affidavit but the motion was denied. But they did not file any counter affidavits in denial of the facts therein stated. They did attach their affidavits and the affidavit of John Cummings to their brief in this court, but these cannot be considered as evidence because they are not made a part of the record.

The Trammel affidavit is cumulative and is pertinent only as corroborative of the facts found by the trial court, and established by the evidence, that the defendants personally solicited damage suits and maintained a corps of agents and runners such as ambulance drivers, undertakers, cab drivers and others who called upon the vic-

tims of disaster in the hospitals or in their homes and arranged to have the defendants call and see them and obtain contracts from them. In addition to the 20 cases specified in the petition of which the trial judge found the defendants guilty the proof shows that they also solicited employment in the same manner, in 11 other cases that were not specified in the petition. One of these cases was a death case which was solicited after the filing of the petition in this case. This evidence was admissible to show the general plan or system under which the defendants operated. Thompson v. State, 171 Tenn., 156, 173, 101 S. W. (2d), 467.

In the light of the proof we cannot agree with the conclusion of the trial judge that the defendants should be suspended for so short a period as one year. A more aggravated and systematic violation of the statute designed to stamp out the evil of ambulance chasing can hardly be imagined. The penalty fixed by the statute ranges from permanent disbarment to suspension for limited periods in the discretion of the court, and we are forced to the conclusion that it was an abuse of his discretion to impose so light a penalty for so flagrant a violation of the statute.

The language of the court in Re German, 348 Mo., 859, 156 S. W. (2d), 678, 683, is in point in this connection. In that case the defendant had been found guilty in 17 counts of the information, and he appealed from an order suspending him from the practice of law for one year. The court pointed out that his offenses were so nearly uniform in pattern, and so often repeated, as to justify the conclusion that the practice amounted to custom or routine, and not mere isolated instances of departure from the recognized standards of propriety.

The court said: "Our only point of difference with the trial court is in relation to the extent of the discipline to be imposed. The able judge who tried the case was confronted, as we are, with a distasteful and onerous duty involving a high degree of responsibility, not only to the accused, but to the profession and the public as well. We recognize that the conditions imposed as prerequisites to reinstatement after the period of suspension virtually amount to disbarment because the likelihood of their performance is remote. But upon a consideration of all the facts and circumstances surrounding the case, we are impelled to the view that outright and permanent disbarment should be ordered; and to that end, the judgment, in so far as it finds appellants guilty of the charges specified, should be, and it is affirmed, and the cause remanded with directions to strike appellant's name from the roll of attorneys, and that he be disbarred."

After all, the question involved is whether the defendants are of such character as entitles them to public confidence, or whether they have been guilty of such conduct as renders them unfit to be members of the Bar. Upon this question their attitude towards the court on the trial has an important bearing. Against an overwhelming weight of testimony they have vehemently denied the specific charges made against them, and have maintained that they were innocent of any wrongdoing. The trial judge in his finding that the "proof excludes every reasonable hypothesis but the hypothesis of the guilt of the defendants" necessarily found that they were guilty of the rankest sort of perjury. We think this is a matter which must be taken into consideration in fixing the penalty and in determining whether the trial judge exercised a reasonable discretion in imposing so mild a punishment as suspension for only one year.

██ ██ In the brief of appellants much is said about the scandalous charges made by the defendant Joe Bean against Judge Ballard in his campaign against him for circuit judge, and copies of his advertisements in the newspapers and of his public utterances over the radio attacking the judicial integrity of Judge Ballard are attached to the briefs. This all occurred after the trial in the circuit court, so it has no place in this record, and cannot be considered here. We will say, however, that the defendant Joe Bean had a right as a citizen to run for the office of judge and that he had great latitude in commenting upon the judicial conduct of his adversary so long as his criticism was made in good faith and did not transcend his right of free speech. See In re Troy, 43 R. I., 279, 111 A., 723; Thatcher v. United States, 6 Cir., 221 F., 801, 129 C. C. A., 255. See, also, note, 53 A. L. R., 1251.

The case has been reviewed de novo here, and we have reached the conclusion that a suspension of the defendants for one year was not commenstrate with the seriousness of the charges of which they were adjudged guilty. We find no extenuating circumstances such as youth or inexperience or ignorance of the ethics of the profession, or even the pressure of necessity which impelled them to be overzealous in the pursuit of business. Their attitude throughout has been one of defiance and of denial that they have been guilty of any unprofessional conduct.

██ Being of opinion that the trial judge failed to exercise a reasonable discretion in the imposition of the penalty under the facts as found we modify his decree so as to suspend the defendants and each of them, and deprive them of the right to practice law in any of the courts of this state, for a period of five years from this

date. In all other respects the findings and judgment of the trial court are affirmed.

We are not unmindful of the importance of the case to the defendants. The duty of disciplining an attorney is an unpleasant one for us, but as said by Chief Justice Turney in Re Henderson, 88 Tenn., 531, 13 S. W., 413, 415, "The conclusion is painful, but imperative. Too much is staked upon the honesty and good conduct of lawyers for courts to wink at flagrant misconduct".

Let a decree be entered in accordance with the views herein expressed. The costs will be adjudged against the defendants.

Felts and Howell, JJ., concur.