## MATTHEW E. O'BRIEN'S PETITION FOR ADMISSION TO THE BAR.

Third Judicial District, Bridgeport, April Term, 1906.

TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

The right of every American citizen to follow any of the common industrial occupations of life does not extend to the pursuit of professions or vocations of such a nature as to require peculiar skill or supervision for the public welfare.

Long before the adoption of the Constitution of this State it was, and ever since has been, the settled and unbroken practice of our courts, under legislative sanction and authority, to admit no one as an attorney not recommended by the bar of the county; and of the bar to recommend no one of whose moral character it was not well satisfied after a careful and impartial investigation.

This usage is a reasonable one, as the personal qualifications of the applicant, aside from his educational attainments, can be more easily determined by the local bar than by a court to which the applicant is probably a stranger; and there is nothing in the Declaration of Rights in our Constitution, nor in the Fourteenth Amendment of the Federal Constitution, which abridges in these respects the long-established powers of court and bar.

In the present case the local bar of the county declined to recommend the applicant. *Held* that, upon his petition to the Superior Court to determine his qualifications for admission, it was proper for it to inquire whether the bar, in withholding its recommendation, had acted fairly and reasonably or from prejudice and ill will; but that having found that the bar had acted fairly and impartially, it did not err in refusing to go further and hear evidence as to the petitioner's qualifications.

Certain wrongful acts of the petitioner, in evidence before the committee of the bar charged with the investigation of his moral character, referred to, and *held* to have warranted the refusal of the bar to recommend him for admission to an examination.

It is in the interest of the public that such investigation or inquiry should be made in private and by a small body of men, and therefore it may well be conducted by a committee of the bar appointed for that purpose; nor has the candidate a right to insist that the committee shall give him the names of those appearing before it.

For like reasons, as well as because the applicant is not a member

O'Brien's Petition.

of the bar, he is not entitled to be heard at the bar meeting on the question of adopting the committee's report.

The question of the bar's approval or disapproval of a candidate for examination is one addressed to the discretion of its members as officers of the court, each voting in view both of any facts that may be brought to his attention upon a hearing, and whatever else may be presumably known to him; and if fairly and impartially passed upon, a vote of disapproval by the bar need not state the reasons therefor.

No direct evidence that the bar acted without prejudice against a candidate is essential; that fact may be inferred by the trial court from the nature of the proceedings and the official character of those concerned in them.

Where the grounds of an alleged want of jurisdiction in this court appear upon the face of the record, a motion to erase, and not a plea to the jurisdiction, is the proper mode of taking advantage of them.

General Statutes, § 788, as amended by Chap. 112 of the Public Acts of 1905, p. 324, prescribes that upon the trial of all matters of fact in any cause or "action," any party who thinks he is aggrieved may appeal. *Held* that the word "action," as thus used, included any proceeding, in the courts named, for the purpose of obtaining such redress as the law provides.

In the present case the court dismissed the petitioner's application. *Held* that this was a final judgment, from which the statute (§ 788) gave the petitioner the right to appeal.

The question whether the action taken by the trial court was an exercise of discretion and therefore not reviewable, is one that the party claiming to be aggrieved has a right to have answered by this court.

"Due process of law," within the meaning of the Fourteenth Amendment of the Constitution of the United States, is any kind of procedure which is suitable and proper to the nature of the case and sanctioned by the established customs and usages of the courts.

Argued April 10th and 12th—decided May 3d, 1906.

PETITION to the Superior Court in Fairfield County for a hearing as to the petitioner's qualifications for admission to the bar. An order of notice to the Fairfield County Bar was made by the court, and on the application of the State's Attorney an Assistant State's Attorney was appointed under General Statutes, § 472, "to aid in the prosecution and hearing of" the cause. After a hearing on

issues of fact, the court (*Roraback*, *J.*) dismissed the petition.   *No error*.

A plea to the jurisdiction was filed in this court, and overruled on demurrer.

*Epaphroditus Peck*, for the appellant (the petitioner).

*John C. Chamberlain*, Special State's Attorney, for the appellee (the Bar of Fairfield County).

BALDWIN, J.   The rules of the Superior Court provide, among other things, that no person shall be admitted as an attorney unless the State bar examining committee shall certify to the clerk of the court in the county in which he applies for admission, that he has been admitted to and has satisfactorily passed an examination upon certain branches of law; and that to entitle an applicant to such an examination he must satisfy the committee that he filed, at least fifteen days previously, a notice of his intention to apply for it with such clerk; that subsequently, at a meeting of the bar, it was voted to approve such intended application; and that he is of good moral character.   The county in which the notice is to be filed is that in which the person filing it last studied, or, if he did not pursue his studies in this State, that in which he resides, if a resident of this State.   Rules of Court, pp. 9, 10, §§ 1–4.

The petitioner filed the required notice in the proper county, and shortly afterward the county bar referred it to its standing committee on the admission of members. A meeting of the bar to act upon their report was called for January 5th, 1906.   The State bar examining committee was to hold its last meeting for nearly six months on the day following.   He had already been provisionally admitted to an examination conducted in its behalf "pending a decision as to its jurisdiction."   On January 3d, the committee of the county bar on the admission of members notified him that they should meet on the evening of January 4th, and that after their "formal meeting" they would

O'Brien's Petition.

like to see him.  He thereupon asked to be allowed to be present at such " formal meeting," to hear the charges, if any, that might be made against him, and to confront any witnesses who might appear to support them.  This request the committee refused, and, after hearing statements, not under oath, from members of the bar and others, some unfavorable and some favorable to the petitioner, notified him to appear before them.  He came before them at ten o'clock, when certain charges which had been previously so made against him were fully explained, and he was heard upon them until midnight, when he requested the committee to take immediate action, so that the matter might come before the bar on January 5th and he might be heard by the State bar examining committee on January 6th.  The committee of the county bar reported on January 5th that they had made inquiry and investigation as to his moral character and qualifications, and would advise that he be not recommended for examination.  The bar accepted the report and took action accordingly.  The report was the result of a careful and impartial examination of the past record and present reputation of the petitioner, and the action of the bar was not actuated by prejudice.  Thereafter, the State bar examining committee, after having heard him on the question of its jurisdiction to admit him to an examination, decided that it had not jurisdiction, and so notified him ; stating in the notice that his examination papers had been marked as entirely satisfactory.

Upon proof of this state of facts the Superior Court decided that it had no power to determine the qualifications of the petitioner, declined to hear evidence as to them, and dismissed the cause.

The appellant contends that the rules of court as to admissions to the bar do not justify the action thus taken.

The first legislation in regard to this subject was had in 1708, when it was provided that no attorney should be admitted to the bar of any County Court or Court of Assistants (the name then commonly given to what was also

known as the Superior Court), " without being first approved of by the court," nor until he had taken a special form of oath, substantially the same as that now prescribed by General Statutes, § 4795. Stat., Ed. 1715, p. 135. In 1730 the number of attorneys in the Colony was limited to eleven, "viz. Three Attorneys in the County of Hartford, and the other Four Counties to have Two Attorneys to Plead at the Bar in each respective County, and no more, which Attorneys shall be Nominated and Appointed from Time to Time as there shall be Occasion by the County Court; each County Court to appoint the number of Attorneys hereby allowed, in the County where such Court doth Preside." Stat., Ed. 1715, p. 373. This limitation of number was repealed the next year, but the exclusive power of admitting attorneys continued in the hands of the County Court until 1808, when it was enacted that " the superior and county courts be, and they are hereby respectively authorized to make such rules and regulations as to them may appear meet, relative to the admission and practice of attornies in such courts ; provided that such rules and regulations shall have no operation upon attornies already admitted by the county courts." Stat., Rev. 1750, p. 9 ; Comp. 1808, p. 67. By the Revision of 1821 this power was again committed exclusively to the County Courts, and remained with them until their abolition in 1855, when it was enacted that " the superior court may admit and cause to be sworn as attorneys, such persons as are qualified therefor agreeably to the rules established by the judges of said court; and all attorneys so admitted shall have the right to practice in all the courts of the state ; and said judges are authorized to establish such rules as they shall judge proper relative to the admission, qualifications, practice and removal of attorneys." Stat., Rev. 1821, p. 141 ; Rev. 1849, p. 208, § 42, p. 222, § 86 ; Public Acts of 1855, p. 28, § 16. This Act of 1855 has ever since remained in force. Rev. 1902, § 458.

The power of the courts over the admission of attorneys thus given or confirmed by the General Assembly, was ex-

ercised from the first in each county largely by the aid of the county bar. It was by this bar that the whole business of the civil courts was, until the closing quarter of the nineteenth century, mainly arranged and made ready for disposition. Assignments of cases for trial were made by the bar at meetings presided over by one of their own number, and standing rules were adopted at such meetings in regard, among other things, to the qualifications, examinations, and mode of admission of attorneys. These rules, while not identical in each county, generally provided that every person seeking admission to the bar must be of full age and good moral character; must have studied law under competent instruction for a certain period of years; and must pass a satisfactory examination upon it before a committee of the county bar, and be recommended by them for the approval of the court. *The Judicial and Civil History of Connecticut,* 186. Being framed by the bar, these rules were known in each county as the "rules of the bar," although deriving their real authority from the sanction, expressed or implied, of the court in that county. *In re Hall,* 50 Conn. 131.

Shortly after the organization of the State Bar Association in 1875, its committee on legal education reported in favor of a new scheme to regulate admissions to the bar, which should be uniform throughout the State, under rules adopted by the judges of the Superior Court. It was proposed that they should appoint a State bar examining committee to hold semi-annual sessions, before which all candidates must appear, and that no one could be admitted to an examination who had not given thirty days' previous notice to the bar of his county, through the clerk of the Superior Court, of his intention to apply for it. On this report, adopted by the Association in 1881, the rules of court on this subject now in force were based.

These rules maintain the ancient policy of the Commonwealth to place the initiative, in the process of admission to the bar, in the hands of the court and bar of the particular county in which admission may, or properly should, be

sought. There the character and antecedents of each applicant for admission will be best known. Its local bar will have the strongest motive and the best opportunity to inquire into them and to ascertain the facts. For the courts to rely upon their opinion and advice was in accord with the ancient practice of England. There, both attorneys and counselors at law came to their office, and could only come to it, as members of certain voluntary societies formed primarily for purposes of legal education, and composed exclusively of those already in practice before the courts and of such as were fitting themselves to enter it. Of these organizations some had been constituted for the benefit of counselors (originally styled "countors," and later "barristers"), and others for that of attorneys. Each society had its own *hospitium*, or Inn, and its own system of discipline and interior government. No one could be called to the bar who was not a member of one of the societies for the education of barristers. No one could be enrolled as an attorney who was not a member of one of the societies for the education of attorneys. In either case, he must appear before the court with the recommendation of his particular society. No one expelled from such a society could be admitted into any other of them, and the liability to expulsion was found in all a sufficient sanction for their rules of discipline. Fortescue, *de Laudibus Legum Angliæ*, Chap. XLIX. No one therefore could engage in the profession of law, in either of its branches, except by the consent and approval of those who were already in practice. Even if one of these societies for the education of barristers should refuse to give to one of its members a call to the bar, although giving him no information as to the reasons, or without reasons, he had no remedy by mandamus or otherwise, before the courts. *The King* v. *Benchers of Gray's Inn*, Dougl., 353. He could only appeal to the twelve judges, in their capacity, established by ancient usage, of visitors of each of the Inns of Court. As such they constituted a domestic forum of final authority to do that which might seem to them fit and proper under the

particular circumstances. Their office was to compose differences between the members of the society subject to the visitation, by determining a matter of complaint arising among the members themselves. *The King* v. *Benchers of Lincoln's Inn*, 7 Dow. & Ry. 351, 366, 368, 4 Barn. & Cr. 855. Similar rules applied to the action of the Inns of Court used by or for the education of attorneys. *The King* v. *Barnard's Inn*, 5 Ad. & E. 17, 19; 1 Pollock & Maitland, Hist. of Eng. Law (2d Ed.) 216.

The fundamental idea underlying this system of things was that the court could best ascertain the qualifications of one desiring to practice before it from the judgment of those under, or in association with, whom he had sought to prepare himself for that work, and who were already engaged in it themselves.

Connecticut, in her early days, was without any recognized centers of legal education like the ancient Inns of Court, but she had in each county the material for shaping a barrier, not dissimilar in kind, against the entrance of unworthy persons to engage in practice before her courts. It was found in the local bar, and the colonial usage of employing them for this purpose has been continued without a break to the present day. It is a reasonable usage. A court is but indifferently adapted to the task of passing upon, the qualifications for engaging in legal practice of those who appear before it as strangers, which are personal to themselves and independent of educational attainments. These can be easily determined by a bar, to some at least of whom they will not be strangers. A court could only proceed, in such a matter, on testimony given in public. The bar can act upon their own knowledge, or upon statements made before them in private, and without the formality of an oath. " It is not enough for an attorney that he be honest. He must be that, and more. He must be believed to be honest. It is absolutely essential to the usefulness of an attorney that he be entitled to the confidence of the community wherein he practices." *Fairfield County Bar* v. *Taylor*, 60 Conn. 11, 17, 22 Atl. 441. To prevent

the admission to their number of any one not thus entitled to general confidence, or otherwise unsuitable to become an officer of the court, certain regulations were adopted in 1800, at a meeting of the bar of Fairfield county, which, with some changes (in this respect immaterial) made in 1875, remained · in force until superseded in 1890 by the present rules of court. By these no one was to be examined for the bar unless he should sustain a good moral character; had studied law in the county during the preceding twelve months, and produced a written certificate from his legal instructor of his knowledge of his moral character, and such other evidence of it as should be satisfactory to the bar; nor, if his legal education before the preceding twelve months had been received out of the county, without having lodged with the clerk of the bar a written certificate from his former instructor of his knowledge relative to his moral character. It was also provided that notice of his intention to apply for an examination must have been given to the bar at a regular bar meeting held during the last preceding term of court, and the fact recorded by the clerk; and that it should be the duty of the chairman of the bar to inquire of every one present at the bar meeting at which the candidate's qualifications were passed upon in relation to that of moral character.

Long before the adoption of the Constitution of the State, therefore, it was the settled practice of the courts to admit no attorneys except on the recommendation of the county bar; and of the bar to recommend none of whose good moral character they were not well satisfied. Each candidate made prima facie proof of possessing that character by a certificate from his instructor. But such hearsay evidence could be met by hearsay evidence. Character, so far as it can be judged by men, rests on opinion.

The practice of the bar in these respects must have been well known to the convention which framed our Constitution in 1818. The leading members of the committee which drafted it were lawyers. The preamble which they reported, states it as the purpose of the Constitution more

effectually to define, secure, and perpetuate the liberties, rights, and privileges, which the people of Connecticut had derived from their ancestors. Its main end was to make it clear what these rights were, and certain that they should be preserved inviolate. We find nothing in the Declaration of Rights which evinces an intention to abridge in any respect the long-established powers of court and bar in reference to the admission of attorneys.

Nor have they been restricted by the Fourteenth Amendment to the Constitution of the United States. It was not designed to disturb settled judicial institutions by setting up any new criterion of what is due process of law. That is found in any kind of procedure, " which is suitable and proper to the nature of the case, and sanctioned by the established customs and usages of the courts." *Ex parte Wall*, 107 U. S. 265, 289, 2 Sup. Ct. Rep. 569.

Nor did the refusal to admit the petitioner to an examination take from him, by authority of the State, either liberty or property. The inalienable right of every American citizen to follow any of the common industrial occupations of life does not extend to the pursuit of professions or vocations of such a nature as to require peculiar skill or supervision for the public welfare. *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746, 763, 2 Sup. Ct. Rep. 652; *Bradwell* v. *State*, 16 Wall. (U. S.) 130, 142. To disbar an attorney is to deprive him of what, within the meaning of our constitutions of government, may fairly be regarded as property. *Bradley* v. *Fisher*, 13 Wall. (U. S.) 335, 354. But one who asks the privilege of admission to the bar is simply seeking to obtain a right of property which he has not got.

The Superior Court, therefore, rightly declined to hear evidence as to questions the decision of which was entrusted to the State bar examining committee, and given to them only in case of those coming before them with the approval of the county bar.

It was proper for it to inquire whether the approval of the bar was withheld after a fair investigation of the

facts. This it did, and the finding shows that there was no ground for deeming their proceedings irregular or their action inconsiderate.

The answer of the Assistant State's Attorney to the petition stated, among other things, that it appeared from the report of the committee of the bar that the petitioner admitted that, a few years before, he had drawn a large number of checks on banks where he had no funds, and had obtained the money on them, which in many instances had not been repaid. His reply set forth that, eight years before, he had failed in business and issued checks of that nature, which went to protest; but that he gave them in good faith, believing that he would be able to take care of them when presented, had since paid as many of his debts as he could, and intended, if possible, to pay the rest.

Upon the hearing before the court (all the evidence given at which has been certified up by request of the petitioner) he testified that he had said to the bar committee, before they made their report, that he knew he had done wrong in putting out these checks, but that he had atoned for it and rectified it. One of the committee also testified that the petitioner admitted before them that, toward fifteen years before, and after he was twenty-one years of age, he had been under arrest in Bridgeport, and escaped from the sheriff, while the question of the amount for which he should be required to give bail was being settled, and then telephoned to the officer, from a place unknown to the latter, that he was out of his reach but would return to his custody if he would agree to let a bond be given for a low amount.

If it be assumed that, during the time that has elapsed since these wrongful acts were done, the petitioner's course of life has been altogether exemplary, this could not wholly efface the stain upon his character. Standing alone, they are sufficient to support the action of the bar in refusing to rank him among those whom they, acting under their oath of office, could recommend to the representatives

of the State as "entitled to the confidence of the community."

The reference by the bar of the intended application of the petitioner for examination to their standing committee on admission to the bar, was obviously proper. It called for inquiries of a delicate nature, and it was in the interest of the public that they should be made in private and by a small body of men. See *In the Matter of Beggs*, 67 N. Y. 120, 121, 123.

For similiar reasons, as well as because he was not a member of the bar, he was not entitled to be heard at the bar meeting on the question of adopting the report of the committee.

The vote of the bar against approving the application was not defective because no reasons for their action were stated in it or otherwise communicated to the State bar examining committee. The question of approval or disapproval was one addressed to their discretion as officers of the court, so only that it should be fairly and impartially exercised. The vote of each member present at the bar meeting was to be given in view both of all facts brought to their attention by the report of the committee and of his own personal acquaintance, if any, with the petitioner and personal knowledge of his record in the past.

A request by the petitioner for certain corrections of the finding has been denied. Two, only, of the corrections asked for merit statement and discussion here.

One is, that of striking out the statement that the bar acted without prejudice against the petitioner. While there was no direct evidence to this effect, the fact was properly inferred by the court from the character of the proceedings taken, and the official character of those concerned in them.

The other is the request for an addition to the finding, to the effect that the petitioner asked the committee of the bar to give him the names of those who appeared before them, and that this was refused. Such an addition would be useless, for the refusal was proper. In a matter of this

peculiar nature, it is only by maintaining the privacy of the investigation that its purposes can be effectually attained.

The plea to the jurisdiction of this court filed by the Assistant State's Attorney raised three points: that no statute authorized such an appeal; that the appellant had been deprived of no legal right; and that the order appealed from was the exercise of a discretion vested in the Superior Court, which was not the subject of review.

It is obvious that the grounds of these objections appeared upon the face of the record upon appeal. A plea to the jurisdiction was therefore unnecessary. A motion to erase the appeal from the docket would have been the proper mode of taking advantage of them. The office of a plea is to set up facts which otherwise would not be apparent to the court, and to pray the benefit of certain legal conclusions from them. Gould on Pleading, Chap. I, §§ 3, 20; III, § 12; V, § 25; *Tweedy* v. *Jarvis*, 27 Conn. 42, 47.

"Upon the trial of all matters of fact in any cause or action, except summary process, in the superior court, . . . if either party thinks himself aggrieved by the decision of the court upon any question or questions of law arising in the trial, he may appeal from the judgment of the court in such cause or action, and remove the said question or questions, for revision, to the supreme court of errors next to be held after the filing of the appeal, in the judicial district where the judgment was rendered; and when a final judgment is rendered in any cause in which a party may be entitled to a writ of error to the supreme court of errors, he may appeal from such judgment to the next term of said court which would have cognizance of a writ of error in the cause; and if the court rendering such judgment shall be of opinion that the appeal is not intended for delay, but that the questions arising on the record are such as entitle the party to a revision thereof, it may allow said appeal upon the conditions hereinafter prescribed." General Statutes, § 788; Public Acts of 1905, p. 324, Chap. 112. "Writs

O'Brien's Petition.

of error for errors in matters of law only, may be brought from the judgments of the superior court, court of common pleas, and any city court, to the supreme court of errors in the judicial district or county where the judgments are rendered." General Statutes, § 819.

The term " action," as thus used, includes any proceeding in the courts named for the purpose of obtaining such redress as the law provides. *Waterbury Blank Book Mfg. Co.* v. *Hurlburt*, 73 Conn. 715, 717, 49 Atl. 198. The petitioner presented to the Superior Court a claim that he had been unjustly deprived of a valuable right by the action of the Fairfield county bar, and a request for a hearing before the court, which had been denied him before them. He asked for and obtained an order from the court, notifying them of the pendency of his petition. The dismissal of that petition was a final judgment. *Woodruff* v. *Bacon*, 34 Conn. 181. It disposed of it absolutely, and adversely to the party claiming here to be aggrieved. Whether he was thus deprived of any legal right was, therefore, a question which the statute authorized him to bring before this court. *Baldwin* v. *Miles*, 58 Conn. 496, 497, 20 Atl. 618; *Belden* v. *Sedgwick*, 68 Conn. 560, 37 Atl. 417. Nor could his appeal be dismissed for want of jurisdiction, on a plea that the action of the court below was the exercise of a discretion not subject to review. The question whether it was or was not such is one which he had a right to have answered by us. *Macready* v. *Wilcox*, 33 Conn. 321; *Fayerweather* v. *Monson*, 61 id. 431, 439, 23 Atl. 878. See *Fairfield County Bar* v. *Taylor*, 60 Conn. 11, 13, 22 Atl. 441.

There is no error.

In this opinion the other judges concurred.