## In re Application of Fre Le Poole Griffiths for Admission to the Bar

HOUSE, C. J., THIM, RYAN, SHAPIRO and LOISELLE, Js.

Argued October 8, 1971—decided January 26, 1972

*R. David Broiles,* for the applicant.

*George R. Tiernan,* for the State Bar Examining Committee.

HOUSE, C. J.   The petitioner is an applicant for admission to the bar.   She is a resident and taxpayer of New Haven and has complied with all the conditions and requirements for admission to take the bar examinations except that she is not a citizen of the United States.   Although she could easily become a citizen of the United States by reason of her marriage to a United States citizen, she has elected to remain a citizen of the Netherlands and has not filed and does not intend to file a declaration of intent to become a citizen of this country.   8 U.S.C. §§ 1427 (f), 1430 (a).   She filed with the clerk of the Superior Court an application for admission to the

bar and the standing committee on recommendations for admission to the bar of New Haven County recommended to the bar of that county that her application be denied as she was not a citizen and thus failed to meet the requirements of the rules of the Superior Court for admission as an attorney. At a meeting of the bar of New Haven County, the report of the standing committee on recommendations for admission to the bar was presented and the members of the bar voted to accept the report of the committee denying her application. She thereupon petitioned the Superior Court for New Haven County for a decree that she be permitted to take the examination as a candidate for the bar and that she be declared eligible for such admission. Her petition was denied on the ground that she did not meet the necessary qualification of being a citizen of the United States which is the first requirement provided by § 8 of the rules of the Superior Court governing admission to the Connecticut bar. Practice Book § 8 (1).

From this judgment the petitioner has appealed to this court. Her assignment of errors claims that the court erred in not declaring § 8 (1) of the Practice Book to be unconstitutional; in not exercising its inherent power to waive the provisions of § 8 (1), in order to avoid injustice to the petitioner and in overruling the several claims of law which she made as follows: "a. Rule 8(1) of the Superior Court Rules discriminates unreasonably against aliens situated as is the petitioner, depriving them thereby of their Constitutional Right to equal protection of the law; b. All forms of discrimination against aliens are presumed invalid unless the State shows an overwhelming or compelling interest in maintaining discrimination. c. Superior Court Rule 8(1)

interferes with the Federal power over immigration. d. Superior Court Rule 8(1) as applied to the petitioner violates international public policy and the First Amendment of the United States Constitution by burdening petitioner's right freely to determine her nationality. e. Superior Court Rule 8(1) creates an unreasonable and arbitrary classification without rational relation to the petitioner's fitness or capacity to practice law. f. Superior Court Rule 8(1) violates equal protection in that it treads upon fundamental personal rights without satisfying the more stringent tests established for such regulations. g. Superior Court Rule 8(1) does not promote a compelling governmental interest. h. Superior Court Rule 8(1) imposes an impermissible burden upon interstate travel."

Before considering the specific assignments of error which are all predicated on a claim that limiting admission to the Connecticut bar to citizens of the United States violates the constitutional rights of the petitioner, it is pertinent to note the historical and legal development of the rules for admission of attorneys to practice law in this state. The early history is traced in *Heiberger* v. *Clark,* 148 Conn. 177, 169 A.2d 652, and at length in *O'Brien's Petition,* 79 Conn. 46, 63 A. 777; see also Loomis & Calhoun, Judicial and Civil History of Connecticut, pp. 183, 184.

The inherent power of the Superior Court as a constitutionally established tribunal to promulgate rules for the admission of attorneys and to fix by rule the qualifications necessary for the practice of law and the procedure to be followed for admission to practice is no longer open to doubt. Conn. const., art. 5 § 1; *In re Application of Dinan,* 157 Conn. 67, 71, 244 A.2d 608; *In re Application of Warren,* 149

Conn. 266, 272, 178 A.2d 528; *Heiberger* v. *Clark,* supra, 185; *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* 145 Conn. 222, 232, 140 A.2d 863; *Rosenthal* v. *State Bar Examining Committee,* 116 Conn. 409, 415, 165 A. 211. Although much assistance in connection with admission to the bar is provided by the local committees of the bar, the decision on standards of admission rests with the judges of the Superior Court. *Heiberger* v. *Clark,* supra, 186; *In re Application of Dodd,* 132 Conn. 237, 243, 43 A.2d 224; *Rosenthal* v. *State Bar Examining Committee,* supra, 414. It was in the exercise of this judicial power that the Superior Court established the requirement of United States citizenship for admission to the bar. The rule first appears in the 1879 Practice Book §§ 4 (3) and 8. It has remained substantially unchanged through the later revisions of the Practice Book in 1890 (see 58 Conn. 561, 590), 1908, 1922, 1934, 1951 and now § 8 (1) of the 1963 edition.

The general duties, obligations and privileges of a member of the Connecticut bar are commonly known, but it is highly relevant to a consideration of the claims of the petitioner to note the unique characteristics coincident with that status. A member of the Connecticut bar is much more than a lawyer in the sense of one "whose profession is to conduct lawsuits for clients or to advise as to the prosecution or defense of lawsuits or as to legal rights and obligations in other matters." Webster, Third New International Dictionary. In the English common-law tradition, he has often been loosely referred to as an "officer" of the court before which he is permitted to practice. See, for example, *Powell* v. *Alabama,* 287 U.S. 45, 73, 53 S. Ct. 55, 77 L. Ed. 158. Indeed, this court has referred to him as such on numerous in-

stances in the past. See *In re Application of Dinan,* supra, quoting from *Heiberger* v. *Clark,* supra, 182; *In re Durant,* 80 Conn. 140, 147, 67 A. 497. It was stated in *Hennessy* v. *Metropolitan Life Ins. Co.,* 74 Conn. 699, 710, 52 A. 490: "An attorney at law, as an officer of the court, speaks in a certain sense by its authority," and in *Cunningham* v. *Fair Haven & W.R. Co.,* 72 Conn. 244, 252, 43 A. 1047: "An attorney represents his client as an officer of the court and is responsible for the purity and fairness of all his dealings in court." Yet an attorney is "not an 'officer' within the ordinary meaning of that term. ... The word 'officer' as it has always been applied to lawyers conveys quite a different meaning from the word 'officer' as applied to people serving as officers within the conventional meaning of that term." *Cammer* v. *United States,* 350 U.S. 399, 405, 76 S. Ct. 456, 100 L. Ed. 474 and footnote, with "[i]llustrations of the confusion and difficulty of courts in explaining what is meant when a lawyer is called an officer of the court"; see also 7 Am. Jur. 2d, Attorneys at Law, § 3.

We noted in *In re Application of Dodd,* 131 Conn. 702, 705, 42 A.2d 36, that "[a]ttorneys have a franchise which is regarded as a property right." In *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* supra, 234, we commented on the special qualifications required of members of the bar and mentioned the dual trust which is imposed on them to act "with fidelity both to the courts and to their clients." We also noted that part of their work involves appearance in court and part involves advice and the drafting of instruments which "has profound effect on the whole scheme of the administration of justice." Id., 235. In *Rosenthal* v. *State Bar Examining Committee,* supra, 414, the court remarked: "The prac-

tice of law is not a craft or a trade; it is a profession the main purpose of which is to aid in the doing of justice according to law between the State and the individual and between man and man. The occasions upon which an attorney may be required to act touch, in many instances, the deepest and most precious concerns of men, women and children. They may involve the liberty, the property, the happiness, the character and the life of his client." Number 32 of the Canons of Professional Ethics refers (Practice Book, p. 12) to attorneys as "ministers" of the law.

In addition, in Connecticut each attorney-at-law admitted to practice within the state, while in good standing, is a commissioner of the Superior Court and in that capacity, may, within the state, sign writs, issue subpoenas, take recognizances and administer oaths. General Statutes § 51-85; *Amato* v. *Campano,* 141 Conn. 247, 250, 105 A.2d 185. Mesne process in civil actions consists of a writ of summons or attachment which "shall be signed by a commissioner of the superior court or a judge or clerk of the court to which it is returnable." General Statutes § 52-89; Practice Book § 28. "Such signing is one of the processes of law by which a man may be deprived of his liberty and property. It is carefully guarded. It is not to be done indiscriminately. *Doolittle* v. *Clark,* 47 Conn. 316, 322. The signing of a writ by a person as a commissioner of the Superior Court is not a mere ministerial act." *Sharkiewicz* v. *Smith,* 142 Conn. 410, 412, 114 A.2d 691. In the exercise of their power to issue writs as commissioners of the Superior Court, Connecticut attorneys may issue writs of attachment "against the estate of the defendant, both real and personal, and for want thereof against his body." General Stat-

utes § 52-279. It is of more than passing interest that the exercise of such authority was formerly restricted to the governor, lieutenant governor, a senator, judge, justice of the peace or the clerk of the court to which the writ of summons or attachment was returnable. See Statutes, 1854, p. 51, § 1. The authority was first granted to all attorneys admitted to practice in this state in 1921. See Public Acts 1921, c. 67.

Attorneys are empowered to "command" actions by county sheriffs and town constables. General Statutes § 52-90. Sheriffs are elected officials within the executive department of the state government by virtue of the constitution of Connecticut, article fourth, § 25. See also General Statutes § 9-182. "The rights, authority and duty . . . conferred upon the sheriff by law, clearly invest him with a portion of the sovereign power of the government to be exercised by him for the public good." *Sibley* v. *State*, 89 Conn. 682, 685, 96 A. 161. Town constables are elected town officers and must be electors of the town in which they are elected. General Statutes §§ 9-185, 9-186. By statutory enactment, the power to "command" these constitutional and municipal officers is vested in Connecticut attorneys, their orders to be issued "[b]y authority of the state of Connecticut." General Statutes § 52-90. Thus, attorneys in Connecticut are granted extraordinary powers to perform their duties before the courts of the state and they are charged with using these powers and acting by the authority of the state in the interests of justice.

Because of these powers and their interwoven dual functions as members of the bar and thereby as commissioners of the Superior Court, newly admitted members of the Connecticut bar take not only

the traditional oath required of attorneys but the oath required by article eleventh, § 1 of the constitution of Connecticut which prescribes that "[m]embers of the general assembly, and all officers, executive and judicial, shall, before they enter on the duties of their respective offices, take the following oath or affirmation, to wit: You do solemnly swear (or affirm, as the case may be) that you will support the constitution of the United States, and the constitution of the state of Connecticut, so long as you continue a citizen thereof; and that you will faithfully discharge, according to law, the duties of the office of . . . to the best of your abilities. So help you God." See also General Statutes § 1-25. Significant in the context of the present case in which the applicant is an alien is not only the obligation to support the constitution of the United States and the constitution of the state of Connecticut but to do so "so long as you continue a citizen thereof."

It is with the foregoing considerations in mind that we now turn to the claims of the petitioner that the requirement of United States citizenship for admission to the Connecticut bar is unconstitutional in the light of current judicial development in the interpretation of the equal protection clause. See "Developments in the Law of Equal Protection," 82 Harv. L. Rev. 1065; "Equal Protection and Supremacy Clause Limitations on State Legislation Restricting Aliens," Utah L. Rev. 136 (1970). It is by the effect of recent decisions in this area of the law that the merit of the petitioner's claims must be decided.

As briefed by the petitioner, three principal issues are raised by her appeal: (1) Does Rule 8 (1) discriminate unreasonably and unconstitutionally against aliens situated as is the petitioner, depriving

her of equal protection of the laws? (2) Does Rule 8 (1) contravene exclusive federal power over immigration? (3) Does Rule 8 (1) unconstitutionally burden the petitioner's right to determine her nationality thereby violating her rights under the first amendment of the United States constitution?

On the first of these issues the petitioner relies on a long line of authority holding that aliens as well as citizens may not be denied equal protection of the laws within the context of the fourteenth amendment to the United States constitution, which provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." That an alien as a "person" comes within the protection of this constitutional provision is well settled. *Yick Wo* v. *Hopkins,* 118 U.S. 356, 369, 6 S. Ct. 1064, 30 L. Ed. 220; *Truax* v. *Raich,* 239 U.S. 33, 39, 36 S. Ct. 7, 60 L. Ed. 131; *Takahashi* v. *Fish & Game Commission,* 334 U.S. 410, 419, 68 S. Ct. 1138, 92 L. Ed. 1478. But this constitutional guarantee of equal protection of the laws does not prohibit a state from classifying its residents based on distinctions which are reasonable and have a foundation in logic and rationality. "The basis for a reasonable classification must show such a difference as to justify the division. 'A proper classification . . . must embrace all who naturally belong to the class—all who possess a common disability, attribute or qualification and there must be some natural and substantial difference germane to the subject and purposes of the legislation between those within the class included and those whom it leaves untouched.'" *St. John's Roman Catholic Church Corporation* v. *Darien,* 149 Conn. 712, 723, 184 A.2d 42; *State* v. *Delgado,* 161 Conn. 536, 290 A.2d 338. Absent an invidious discrimination of the type usually associated with clas-

sifications involving race or a specific nationality, the basic test of constitutional validity is one of reasonableness. *Graham* v. *Richardson,* 403 U.S. 365, 371, 91 S. Ct. 1848, 29 L. Ed. 2d 534; *McGowan* v. *Maryland,* 366 U.S. 420, 425, 81 S. Ct. 1101, 6 L. Ed. 2d 393.

The United States Supreme Court has rejected foreign citizenship as a legitimate basis for state restrictions on the right to own property or to engage in "the common occupations of the community." *Truax* v. *Raich,* supra, 41; *Takahashi* v. *Fish & Game Commission,* supra; but, as observed in a resume entitled "Constitutionality of Restrictions on Aliens' Right to Work," 57 Colum. L. Rev. 1012, 1026, a notable exception to the rule is the exclusion of aliens from the professions. It does not appear that the Supreme Court has passed on the specific question presented on this appeal but the applicability of the "rational connection" test was expressly prescribed with respect to admission to the bar in *Schware* v. *Board of Bar Examiners,* 353 U.S. 232, 238–39, 77 S. Ct. 752, 1 L. Ed. 2d 796. There the court said: "A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. . . . [A]ny qualification must have a rational connection with the applicant's fitness . . . to practice law." See *Konigsberg* v. *State Bar of California,* 353 U.S. 252, 77 S. Ct. 722, 1 L. Ed. 2d 810.

We have already discussed the unique status accorded to the members of the Connecticut bar, the extensive power, authority and public and private obligations entrusted to them in the administration of justice, as well as the relationship of their

functions to the administration of the constitutionally established judicial branch of the state government. In our opinion, there is clearly a rational connection between a requirement of loyalty and allegiance to the state, with the concomitant adherence to its political and judicial system, and the exercise of those powers, participation in the state's judicial branch of government, and membership in what Mr. Justice Harlan of the United States Supreme Court has referred to as "a profession in whose hands so largely lies the safekeeping of this country's legal and political institutions." *Konigsberg* v. *State Bar of California,* 366 U.S. 36, 52, 81 S. Ct. 997, 6 L. Ed. 2d 105. We deem it entirely reasonable that the Superior Court as a constitutional court requires that persons, to be admitted to assist the court in the administration of justice and the laws of the state, be citizens and not owe their primary allegiance to a foreign power.

In our conclusion we find ourselves in accord with the majority of the few cases which have discussed the relationship between citizenship and admission to the bar. See *Application of Skousen,* 79 Ariz. 325, 289 P.2d 406; *Large* v. *State Bar,* 218 Cal. 334, 23 P.2d 288; *Petition of Rocafort,* 186 So. 2d 496 (Fla.); *Ex parte Thompson,* 10 N.C. 355. We also observe that the overwhelming majority of states requires that an applicant for admission to the bar be, at the time of his application, a citizen or intend to become one. See "Alien Lawyers in the United States and Japan—A Comparative Study," 39 Wash. L. Rev. 412, 414-15; Bar Examiner's Handbook, p. 312 (1968).

The most recent case on the subject to come to our attention is *Application of Park,* 484 P.2d 690, 696, decided by the Supreme Court of Alaska on

April 30, 1971. It concerned an applicant for admission to the bar who was not yet a citizen but who the court was "certain" had "the requisite intent to be a citizen . . . in a degree and manner that would satisfy requirements for admission to the Alaska bar." The court asserted that the "inherent and final power and authority to determine the standards for admission to the practice of law in Alaska" resided in its Supreme Court and, accordingly, statutory enactments and state bar rules requiring citizenship for admission to practice were declared to be of no force and effect as encroachments on the court's prerogatives. Far from supporting the contentions of the petitioner in the case at bar, the court expressly disclaimed any indication "that there may not be imposed prerequisites for admission to the bar which bear on the qualifications of an applicant as they relate to citizenship" and concluded with the comment: "We are confident that the Alaska Bar Association can promulgate and present to this court for approval an appropriate rule regarding residence and intent to become a citizen which will come within the scope of this opinion regarding admission of resident aliens to the Alaska bar." In the case before us not only is the petitioner not a United States citizen but she has made it clear that she has no intention of applying for such citizenship.

In reaching our conclusion that the requirement of § 8 (1) of the Practice Book does not violate the petitioner's right to the equal protection of the laws guaranteed by the fourteenth amendment, we have not overlooked her reliance on the recent decision of the United States Supreme Court in *Graham* v. *Richardson,* 403 U.S. 365, 91 S. Ct. 1848, 29 L. Ed. 2d 534, which held to be invalid state restrictions on

welfare aid to aliens. It stated (p. 372) that discrimination against individuals on the basis of alienage, "like those based on nationality or race are inherently suspect and subject to close judicial scrutiny" and that "[a]liens as a class are a prime example of a 'discrete and insular' minority [see *United States* v. *Carolene Products Co.,* 304 U.S. 144, 152–53, n. 4, (1938) [58 S. Ct. 778, 82 L. Ed. 1234] for whom such heightened judicial solicitude is appropriate. Accordingly, it was said in *Takahashi,* 334 U.S. . . . [410, 420, 68 S. Ct. 1138, 92 L. Ed. 1478], that 'the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits.'" A similar consideration was also expressed in *Purdy & Fitzpatrick* v. *California,* 71 Cal. 2d 766, 456 P.2d 645, holding a public-employment citizenship requirement unconstitutional. The court there noted that because aliens are denied the right to vote they "lack the most basic means of defending themselves in the political processes" and "[u]nder such circumstances, courts should approach discriminatory legislation with special solicitude." See, to the same effect, *Dougall* v. *Sugarman,* 330 F. Sup. 265 (S.D. N.Y.). Applying the tests of "special solicitude," "firm justification," "special scrutiny" and "compelling state interest" as directed in these decisions, we, nevertheless, conclude that, tested in the light of these requirements the provision of § 8 (1) of the Practice Book is not constitutionally invalid as to the petitioner as a denial to her of the equal protection of the laws. Attorneys are the means through which the majority of the people seek redress for their grievances, enforcement and defense of their rights and compensation for their injuries and losses. The courts not only demand their loyalty,

confidence and respect but also require them to function in a manner which will foster public confidence in the profession and, consequently, the judicial system. In this light the requirement of citizenship is not simply reasonable but is basic to the maintenance of a viable system of dispensing justice under our form of government.

A further claim of the petitioner is that § 8 (1) of the Practice Book contravenes the exclusive federal power over immigration. Her argument is that the rule, because it denies aliens admission to the bar, unduly interferes with the entry and employment of immigrants—a field constitutionally reserved to Congress. See 42 U.S.C. § 1981; *Fong Yue Ting* v. *United States,* 149 U.S. 698, 713, 13 S. Ct. 1016, 37 L. Ed. 905. By the latter statute, Congress has enacted a comprehensive plan for the regulation of immigration and naturalization and granted to aliens the full and equal benefits of all laws in this country. The Supreme Court cited this instance of federal supremacy in the *Graham* case, supra, in concluding that state laws which restrict the eligibility of aliens for welfare assistance solely because of their alienage conflicted with federal policy and, hence, were unconstitutional. The court repeated with approval what it had earlier said in 1915 in *Truax* v. *Raich,* 239 U.S. 33, 42, 36 S. Ct. 7, 60 L. Ed. 131: "The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government. . . . The assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the State would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work. And, if such a policy were permissible, the practical result would

be that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the States as chose to offer hospitality." To the same effect is *Takahashi* v. *Fish & Game Commission,* 334 U.S. 410, 419, 68 S. Ct. 1138, 92 L. Ed. 1478, where the court said: "State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration."

We do not agree with the contention of the petitioner that federal preemption of control of immigration and the doctrine of federal supremacy as indicated in the cited cases renders § 8 (1) of the Practice Book unconstitutional as to her as an unlawful interference with the exercise of that federal power. The essence of the preemption doctrine as declared in the cited cases is that a state may not unreasonably interfere with the right of aliens to share in the economic and social benefits of the community wherein they reside. The obvious reason for the rule is that highly restrictive state statutes which so affect the ability of aliens to earn a living or receive a general benefit from residing in a community tend to alter and restrict the normal balance of population distribution and, thus, thwart the federal regulatory scheme which promotes the mobility of aliens within the United States. *Truax* v. *Raich,* supra. If such statutes were permitted to stand, it is obvious that the least restrictive state would be subject to a mass influx of aliens far out of proportion to that which would be probable in a totally free society. Clearly, a state regulation or statute which had that effect must of necessity fall as a

violation of the supremacy rule. On the other hand, the effects of § 8 (1) of the Practice Book on the federal regulatory scheme are at the most minimal and the restriction on admission to the bar of aliens can have but the slightest effect on the millions of aliens in this country. To those who are otherwise qualified, their individual decision on where to reside and practice will hardly affect the general balance of alien population. This is particularly true in view of the fact that the same qualification is required in an overwhelming majority of the states. "Alien Lawyers in the United States and Japan—a Comparative Study," 39 Wash. L. Rev. 412, 414-15.

In short, § 8 (1) of the Practice Book has no discernible impact on the goals behind our federal immigration laws. It is only "statutes, rules, or regulations which unreasonably burden or restrict this [interstate] movement" which must fail. *Shapiro* v. *Thompson,* 394 U.S. 618, 629, 89 S. Ct. 1322, 22 L. Ed. 2d 600.

Another significant factor is that § 8 (1) of the Practice Book differs materially from the alien restriction statutes which have been held to be unconstitutional. Those cases have concerned state actions designed to serve the economic benefit of its citizens to the detriment of aliens. The *Graham* case held that the state could not discriminate in paying welfare benefits; the *Takahashi* case decided that aliens as well as citizens must be given the right to earn their living from the sea; the *Truax* case declared invalid a statute which limited the employment of aliens in all occupations. The intent of § 8 (1) is clearly neither to insure economic success for citizens as opposed to aliens nor to discourage aliens from settling within the jurisdiction. Rather, it was intended to serve a greater need than mere

financial success for a selected class. We are persuaded that the rule is neither inconsistent with nor repugnant to the power over immigration conferred on Congress by article first § 8 of the constitution of the United States.

The petitioner's remaining claim is that § 8 (1) "violates international public policy and the first amendment of the United States constitution by burdening petitioner's right freely to determine her nationality." In support of her claim with respect to international public policy she cites the articles of the 1933 Montevideo Convention on the Nationality of Women, the 1957 agreement of the United Nations Convention on the Nationality of Women and the 1967 United Nations General Assembly's Declaration on the Elimination of Discrimination against Women. Article 5 of the latter declaration states: "Women shall have the same right as men to acquire, change or retain their nationality. Marriage to an alien shall not automatically affect the nationality of the wife either by rendering her stateless or by forcing on her the nationality of her husband." She does not contend that any of these international agreements entered into by the United States has the force of a treaty which is constitutionally binding on the states. Such a contention would be wholly without substantive support. See *Sei Fujii* v. *State,* 38 Cal. 2d 718, 242 P.2d 617; *Camacho* v. *Rogers,* 199 F. Sup. 155, 157 (S.D.N.Y.); *Hitai* v. *Immigration & Naturalization Service,* 343 F.2d 466 (2d Cir.). Rather, as we understand it, the petitioner's argument is that the participation of the United States in these conventions is indicative of an overall national philosophy which must be read into the first amendment to the federal constitution. Thus, it is her contention that "as a matter of con-

stitutional law . . . an individual must be free to determine what acts of fundamental allegiance he chooses to engage in" and that § 8 (1) of the Practice Book, as applied to her, "clearly imposes a severe burden on her right of free choice in matters of fundamental allegiance. For either she has to give up her nationality, or she cannot be admitted to the Connecticut Bar." She claims that, consequently, § 8 (1) is inconsistent with international public policy and with the first amendment to the federal constitution.

The petitioner cites no authority which directly supports her theory but relies on cases holding that state regulations which infringe on freedom of speech cannot be sustained in the absence of a showing of a "compelling state interest." *Sherbert* v. *Verner,* 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965; *Flemming* v. *Nestor,* 363 U.S. 603, 80 S. Ct. 1367, 4 L. Ed. 2d 1435; *Shapiro* v. *Thompson,* supra. The force of these cases, however, is brought to bear only where there is an attempt to control speech directly. Where the attempt is to protect against an evil within the sphere of state concern, the rule is that a proscription which only tangentially touches on protected freedoms will be sustained. *Speiser* v. *Randall,* 357 U.S. 513, 527, 78 S. Ct. 1332, 2 L. Ed. 2d 1460.

The rule is a classic example of a state regulation designed not to restrict a right but to protect rights. It is not designed to lead the petitioner into a circumstance where she will be forced to choose between conflicting allegiances but rather to assure that the force of her continued allegiance to a foreign power will not be brought to bear in areas affected with significant public interest in a state where she chooses to remain an alien. By withhold-

ing her allegiance from the United States she "leaves outstanding a foreign call on . . . [her] loyalties which international law not only permits our government to recognize but commands it to respect." *Harisiades* v. *Shaughnessy,* 342 U.S. 580, 585, 72 S. Ct. 512, 96 L. Ed. 586.

We do not find § 8 (1) of the Practice Book to be unconstitutional. Nor do we find it unreasonable that as a condition to the petitioner's admission to the bar of this state and the exercise of the rights and authority of an attorney admitted to practice in its courts that the petitioner take the necessary steps leading to citizenship, including the oath of citizenship prescribed by 8 U.S.C. § 1448 to "renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which the petitioner was before a subject or citizen" and "to bear true faith and allegiance" to the United States.

There is no error.

In this opinion the other judges concurred.